*This opinion is subject to revision before final publication in the Pacific Reporter*

**2020 UT 10**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

UTAH DEPARTMENT OF TRANSPORTATION,

*Petitioner,*

*v.*

TARGET CORPORATION and
WEINGARTEN/MILLER/AMERICAN FORK, LLC,

*Respondents.*

No. 20180283

Heard December 10, 2018

Reheard September 20, 2019

Filed February 28, 2020

On Certiorari to the Utah Court of Appeals

Attorneys:

Sean D. Reyes, Att'y Gen., Barbara H. Ochoa,
William H. Christensen, Asst. Att'y Gens., Salt Lake City,
for petitioner

Troy L. Booher, J. Frederic Voros, Jr., Dick J. Baldwin, Kevin E.
Anderson, Robert E. Wilkinson, Salt Lake City, for respondent
Target Corporation

Jeffrey W. Appel, Matthew N. Evans, Aaron C. Hinton,
Salt Lake City, for respondent
Weingarten/Miller/American Fork, LLC

ASSOCIATE CHIEF JUSTICE LEE authored the opinion of the Court, in which CHIEF JUSTICE DURRANT, JUSTICE HIMONAS, JUSTICE PEARCE, and JUSTICE PETERSEN joined.

ASSOCIATE CHIEF JUSTICE LEE, opinion of the Court:

¶1 Target Corporation and Weingarten/Miller/American Fork, LLC (Miller) (collectively, claimants) owned property in

American Fork that could be seen from both I-15 and Main Street. The property had a convenient "right-out" exit (an exit with a right-turn only) that provided access to northbound I-15. A portion of the claimants' property was condemned by the Utah Department of Transportation (UDOT) for two highway construction projects in 2009. The UDOT projects involved the reconstruction of the freeway interchange near the claimants' property. UDOT condemned a small portion of the property owned by Target and Miller. A sliver of the new interchange was built on the taken property. And the interchange interfered with both the property's visibility and the right-out exit.

¶2   At trial the jury awarded the claimants $2.3 million in severance damages. UDOT challenged the severance damages award on appeal on two grounds. First, it asserted that the claimants had failed to present sufficient evidence of causation and damages to support the award—contending, in particular, that the claimants had failed to establish that their severance damages stemmed from the portion of the interchange situated on the claimants' property condemned by UDOT, or to show that the portion of the interchange that rested on their former property was "essential" to UDOT's "project as a whole" under *Ivers v. Utah Dep't of Transp.*, 2007 UT 19, ¶ 21, 154 P.3d 802, *overruled in part on other grounds by Utah Dep't of Transp. v. Admiral Beverage Corp.*, 2011 UT 62, 275 P.3d 208. Second, UDOT challenged the severance award on the ground that it encompassed damages stemming from UDOT's construction of sound walls along the freeway, which in UDOT's view were not part of the interchange.

¶3   The court of appeals upheld the jury verdict. It rejected UDOT's first argument on the ground that a claimant whose property is taken even in part for the construction of a view-impairing structure is entitled to a presumption of causation—that the severance damages were caused by the structure so long as the visibility impairment "stem[s] from a 'structure' that is built upon the part of the property that was taken." *Utah Dep't of Transp. v. Target Corp.*, 2018 UT App 24, ¶ 20, 414 P.3d 1080. The court of appeals deemed the new interchange to be the relevant "structure" for purposes of this analysis. *Id.* ¶ 34. And because the interchange rested partially on the claimants' severed property, the court of appeals held that the claimants had no burden to show that their severance damages stemmed from the portion of the interchange on their condemned property or to demonstrate that the taken property was essential

to the overall project. *Id.* ¶ 42. The court of appeals also rejected UDOT's second argument. It deemed the sound-wall issue to be inadequately briefed, concluding that it could not tell from the briefs "exactly which 'sound walls' UDOT is referring to or where they are located." *Id.* ¶ 36 n.10.

¶4 We granted *certiorari* to consider important, unresolved questions under our case law. We affirm the decision of the court of appeals and uphold the jury verdict, but do so on grounds that differ somewhat from those adopted by the court of appeals. We tether our clarified standard to the text of the operative statute, which provides for severance damages caused by the construction of an "improvement in the manner proposed" by a condemning authority. UTAH CODE § 78B-6-511(1)(b). And we explain that the term "improvement," as originally understood and read in the context of the governing statute, encompasses any portions of an amelioration of land that advances the "purpose" for which the condemning authority takes the land at the time of the proposed improvement. Applying that standard (as explained further below), we hold that the jury's award of severance damages was appropriate because the claimants put on adequate evidence that their damages were caused by UDOT's construction of an improvement in the form of the new interchange. And we explain how this standard comports with our prior case law in this area. We also affirm the court of appeals' conclusion that the sound-wall issue was inadequately briefed, albeit again on grounds that depart somewhat from those identified by the court of appeals.

## I. BACKGROUND

¶5 In 2009 UDOT condemned two small portions of the claimants' land in fee simple. It also took a perpetual slope easement on the claimants' property. The condemnation actions were initiated in connection with two major UDOT projects in Utah Valley. The first project involved widening I-15 from Santaquin to the Salt Lake County line. The second project involved the construction of a new road from American Fork to Saratoga Springs. The two projects intersected near the claimants' property at the Main Street Interchange in American Fork—the point where Main Street in American Fork intersects with I-15 and motorists can either enter the freeway or cross over I-15 via an overpass.

¶6 Because the projects required widening both Main Street and I-15, UDOT decided to replace the then-existing interchange

with a larger interchange that employed an innovative diverging-diamond design. That new design required UDOT to increase the height of the overpass across I-15 and increase both the height and overall size of the on- and off-ramps.

¶7    UDOT's construction of the new interchange necessitated the condemnation of various properties, including relatively small portions of the claimants' property—property on which claimants have built a Target store and surrounding stores in a shopping mall located to the northeast of the interchange.[1] Specifically, UDOT acquired both a 756 square-foot and a 928 square-foot parcel in fee simple and an 8,825 square-foot perpetual slope easement from the claimants. UDOT used the slope easement to pile up a large amount of dirt to create a berm to support the raised northbound on-ramp. The vast majority of the interchange was built on property already owned by UDOT or taken from others.

¶8    UDOT's construction activities decreased the market value of the claimants' remaining property in two main ways. First, the project limited claimants' convenient access to the freeway. Prior to the construction of the new interchange, the claimants' property had enjoyed a direct "right-out" exit onto Main Street. That exit allowed drivers leaving the mall's parking lot to turn right onto Main Street and then easily merge onto northbound I-15 after driving a short distance westbound on Main Street. But because UDOT's new interchange required the elevation of Main Street leading up to the interchange, the right-out exit was no longer safe or feasible. And the loss of the most heavily trafficked exit from the mall meant that drivers had to use a different exit located to the east of the property.

¶9    Second, the increased height of the interchange and the on- and off-ramps interfered with the ability of passersby to view the claimants' property. Prior to UDOT's projects, drivers moving

---

[1] Target and Miller are separate entities, but both have ownership interests in the property from which the condemned land was severed. Target owns the property on which its store is located within the mall. Miller owns most of the rest of the land on which the mall sits. Both share a parking lot and a cross-easement across the mall.

in either direction on Main Street or I-15 could easily see the mall. Afterwards, parts of the interchange obstructed motorists' view.

¶10 In the district court, the claimants sought recovery for both the physical takings as well as severance damages for the decrease in market value, including diminution resulting from decreased access and visibility. They presented expert testimony from an appraiser who had valued claimants' property both before and after UDOT's construction activities. The appraiser testified that the remaining property's market value had decreased by more than $2.3 million. According to the appraiser, the main factors contributing to the decrease in market value were the loss of visibility and the right-out exit.

¶11 After the claimants rested, UDOT moved for partial directed verdict on the severance damages issue. It argued that the claimants had failed to show that severance damages were warranted under *Ivers v. Utah Dep't of Transp.*, 2007 UT 19, 154 P.3d 802, *overruled in part on other grounds by Utah Dep't of Transp. v. Admiral Beverage Corp.*, 2011 UT 62, 275 P.3d 208, because the claimants hadn't produced evidence that the taken property was "essential" to the project as a whole. The district court denied the motion, ruling that there was enough evidence to support a finding of essentialness.

¶12 The severance damages issue thus went to the jury with instructions that "[t]he measure of severance damages is the difference between the fair market value of the remaining property before the taking and the fair market value of the remaining property after the taking." The jury was also instructed that it could award severance damages either for (1) "any loss of fair market value to the remaining property caused by the taking and/or by the construction of the highway projects on the property taken" or (2) "damages caused by an improvement that is built on property other than that which was taken if the use of the property taken was essential to the completion of one or the other of the highway projects as a whole."

¶13 The jury found that the claimants were entitled to $2,381,294 in severance damages. There was no special verdict form, so the jury did not specify whether it had awarded damages under the first or second prong of the jury instruction.

¶14 UDOT moved for a judgment notwithstanding the verdict on the severance damages issue, again asserting that the

claimants had failed to prove that the taken property was essential to the project as a whole. That motion was also denied.

¶15 UDOT filed an appeal. It challenged the district court's denial of its motions for partial directed verdict and judgment notwithstanding the verdict. The court of appeals affirmed. *Utah Dep't of Transp. v. Target Corp.*, 2018 UT App 24, 414 P.3d 1080. Trying to make sense of our case law in this field, the court of appeals concluded that severance damages are appropriate "only if landowners can show a causal link between the taking of a portion of their land and the diminution in the value of the remainder." *Id.* ¶ 17 (citation omitted). It then ruled that "[t]here are two methods by which a landowner can demonstrate the requisite causal link." *Id.* ¶ 20. "First, if the visibility issues stem from a 'structure' that is built upon the part of the property that was taken, causation is presumed." *Id.* (citing *Ivers*, 2007 UT 19, ¶ 20). And "[s]econd, if the visibility issues stem from a 'structure' that was *not* built on the part of the property that was taken, causation is not presumed, and the property owner is entitled to severance damages only if it can demonstrate that 'the use of the condemned property is essential to the completion of the project as a whole.'" *Id.* (quoting *Ivers*, 2007 UT 19, ¶ 21).

¶16 Applying this framework, the court of appeals held that the entire interchange was the relevant "structure." *Id.* ¶ 34. And because the interchange rested partially on the claimants' severed property, the court of appeals held that claimants were not required to show that the condemnation of their property was essential to the project as a whole. *See id.* ¶¶ 31, 34, 42; *see also id.* ¶ 23 ("[I]n order to be presumed to have caused severance damages to the remaining parcel, a view-impairing structure need not be entirely constructed within the taken parcel."). Because part of the structure (the berm) had been constructed on property taken from the claimants, damages stemming from the construction of the entire interchange were presumed and the jury award was appropriate. *Id.* ¶¶ 35–37.

¶17 The court of appeals refused to consider UDOT's argument that certain sound walls were not part of the relevant "structure." It held that the argument had been inadequately briefed and "as a result [the court was] not certain exactly which 'sound walls' UDOT [wa]s referring to or where they are located." *Id.* ¶ 36 n.10. UDOT filed a petition for *certiorari*, which we granted.

## II. DISCUSSION

¶18 We granted certiorari to consider the two questions addressed by the court of appeals. In the course of our consideration of this important case we realized that our case law in this area needed clarification and refinement. And we accordingly ordered supplemental briefing,[2] asking the parties to offer input on whether and how we might reformulate the standards set forth in our case law and whether we could do so consistent with principles of *stare decisis*.

¶19 The parties' briefs were helpful. They highlighted imprecisions and inconsistencies in our case law on the standards for the award of severance damages. In light of the supplemental briefing, and upon reconsideration of our case law in this field, we affirm the court of appeals' decision in this case but do so on the basis of clarified standards of law—standards that are more clearly tethered to the text of the statute that has long governed in this area, Utah Code section 78B-6-511(1)(b).

### A. Proof of Causation for Severance Damages

¶20 The fountainhead of legal authority in a case like this one is found in a governing statute—Utah Code section 78B-6-511(1)(b). That provision states that when a condemning authority takes "a part of a larger parcel," the property owner is entitled to "the damages which will accrue to the portion not sought to be condemned by reason of its severance from the portion sought to be condemned and the construction of the improvement in the manner proposed by the plaintiff." *Id.* This statute may not be a model of clarity. But it states the governing

_____

[2] We do not do so lightly. We understand that an order requesting supplemental briefing can be costly for the parties and will delay our disposition of the case. That said, we are reluctant to resolve a case on the basis of a revised legal standard without giving the parties an opportunity to first be heard on the matter. We figure the parties will see it the same way—that they would rather have input in our process instead of seeing a revised legal standard for the first time in a published opinion. And our commitment to procedural fairness may outweigh our concerns about cost or delay.

law in this field. And our job is to give meaning to this provision as we apply it to the cases that come before us.

¶21 Our recent cases have emphasized the importance of sticking to the text of governing rules and statutes. We have warned of the perils of judicial glosses that skate past the governing terms of the law. *See State v. Wilder*, 2018 UT 17, ¶¶ 25, 33, 38, 420 P.3d 1064 (disavowing the test set forth in *State v. Finlayson*, 2000 UT 10, 994 P.2d 1243, and *State v. Lee*, 2006 UT 5, 128 P.3d 1179, and instead applying the plain language of Utah's merger statute); *State v. Lucero*, 2014 UT 15, ¶ 32, 328 P.3d 841 (holding that the plain text of rule 403 of the Utah Rules of Evidence override the factors set forth in our decision in *State v. Shickles*, 760 P.2d 291, 295–96 (Utah 1988), *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016). And, where appropriate, we have reframed our case law by mooring it more closely to the governing text—in circumstances where our past decisions are not only incompatible with the controlling law, but based on a framework that is judicially unworkable (in the sense that it doesn't lend itself to predictable application in our courts). *See Wilder*, 2018 UT 17, ¶ 27 (noting that the unworkability of the "unpredictable and confusing" *Finlayson-Lee* test supported our decision to repudiate that test and apply the plain text of the statute).

¶22 We have reconciled this kind of revision with our doctrine of *stare decisis*. Because a judicially unworkable legal standard does not lend itself to consistent application, we have noted that a course correction in our case law will not upset any substantial reliance interests. *See Eldridge v. Johndrow*, 2015 UT 21, ¶ 22, 345 P.3d 553 (explaining that "how well [a precedent] has worked in practice" and "the extent to which people's reliance on the precedent would create injustice or hardship if it were overturned" are considerations in determining the strength of the presumption against overruling precedent). And in such circumstances we have explained that we have broader license to reformulate and clarify our law, *see id.*, particularly where we are merely reformulating and clarifying, and not outright overruling a prior decision.

¶23 These principles hold true here. For reasons explained below, our case law in this field has strayed substantially from the text of the controlling statute. Our decisions, moreover, state fuzzy standards that do not lend themselves to predictable application in our courts. Indeed, each of the parties to this

litigation has indicated that our case law is in need of clarification. For these reasons we see the need to reformulate and clarify the governing standards in this field. We do so by redirecting our case law to focus more specifically on the terms of the governing statute. And we repudiate standards set forth in our cases that confuse the law by departing from the statutory text. While we repudiate these non-statutory standards embedded in our case law, we need not and do not directly overrule any of our prior decisions. We reaffirm them to the extent that they reached results that are consistent with the correct standard as set forth in this opinion.

¶24  In the paragraphs below, we first show how the language of our cases has departed from the governing statutory standard. Second, we clarify the proper framework for analyzing severance damages claims under Utah Code section 78B-6-511(1)(b), emphasizing that this is the controlling framework and disavowing contrary formulations in our case law. Third, we apply the statutory standard to the case before us and affirm the jury's award of severance damages. Finally, we show how the statutory standard test we establish today can be reconciled with the outcomes of our past decisions.

### 1. Our Cases

¶25 Utah Code section 78B-6-511(1)(b) (emphasis added) provides that the owner of a partially condemned piece of property is entitled to severance damages caused to the non-severed property "by reason of its severance from the portion sought to be condemned *and* the construction of the improvement in the manner proposed by the [condemning authority]." Under this provision, the key question in a case like this one is whether the severance damages awarded to Target and Miller were caused "by reason of . . . construction of the improvement in the manner proposed by" UDOT. *See id.* The statutory text requires some judicial elaboration—as to the meaning of "improvement," and on what it means for an improvement to be constructed "in the manner proposed" by the condemning authority.

¶26 Our cases, however, have strayed from these statutory terms in several respects. The outcomes of our past decisions are at least arguably defensible under the statutory mandate. And

consequently we need not overrule them. But our opinions have muddied the waters by introducing new terms and legal standards divorced from the statutory text.[3] And we take this opportunity to rein in these troubling aspects of our case law in this area.

¶27 The language of our case law has departed from the statutory text in two main ways. First, we have tied our analysis to the construction of "structures," or sometimes "projects," rather than "improvements." In a case involving the condemnation of a portion of a property to build a frontage road in connection with a highway expansion project, for example, we ruled that the property owner could recover damages for the construction of the new highway "structure" so long as his property was essential to the "project." *Ivers v. Utah Dep't of Transp.*, 2007 UT 19, ¶ 21, 154 P.3d 802, *overruled in part on other grounds by Utah Dep't of Transp. v. Admiral Beverage Corp.*, 2011 UT 62, 275 P.3d 208. And in another case, we suggested that a property owner could recover harms caused by the construction of a "structure" that was partially located on the taken parcel. *Utah State Rd. Comm'n v. Miya*, 526 P.2d 926, 929 (Utah 1974).

¶28 Second, we have sent mixed signals about the effect of the original property line (pre-severance) on the availability of severance damages. On the one hand, our older cases suggested that a claimant may be limited to severance damages stemming only from actions taken on the original property.[4] On the other

---

[3] This is a difficult area of law requiring a delicate balance of competing policy interests. But the competing policy interests should be balanced by the legislature, not the judiciary. We should implement, not second-guess, the balance struck by the legislature in the governing statute.

[4] *See State v. Harvey Real Estate*, 2002 UT 107, ¶ 10, 57 P.3d 1088 (holding that the severance damages statute "gives a landowner the right to present evidence of damages caused by the construction of the improvement made on the severed property[,]" not "the right to present evidence of damages caused by other facets of the construction project"); *Utah Dep't of Transp. v. D'Ambrosio*, 743 P.2d 1220, 1222 (Utah 1987) ("Severance damages are those caused by the taking of a portion of the parcel

(continued . . .)

hand, our more recent cases have indicated that severance damages are available if they flow from actions taken outside the original property line—so long as the severance is deemed "essential" to the "project as a whole." *Ivers*, 2007 UT 19, ¶¶ 20–21.

¶29 These case-law glosses on the statutory text are troubling—not only because they change the subject from the governing terms of the law, but also because they do so using terms that rob our law of its essential determinacy, and thus its susceptibility to predictable application. When we speak inconsistently about improvements, structures, and projects, we make it difficult for our courts to draw clear lines in this important area. These terms may have different meanings as applied in different cases. And precision in terminology is important if we are to ensure that our cases are decided in accordance with the rule of law (instead of the vague preferences of a judge or panel who is deciding a given case). The same goes for the inquiry into what is "essential" to a "project as a whole." Our cases have never defined essentiality. And the supplemental briefing in this case confirmed the difficulty of drawing a clear line in defining this term.

## 2. The Statutory Framework

¶30  This takes us back to first principles. And first principles in a case like this one are found in the statutory text. *See Graves v. N. E. Servs., Inc.*, 2015 UT 28, ¶ 67, 345 P.3d 619 ("[T]he governing law is defined not by our abstract sense of legislative purpose, but by the statutory text that survived the constitutional process . . . . The statutory language is primary; legislative history is of secondary significance."). The governing statute says that "[t]he court, jury, or referee shall hear any legal evidence offered by any of the parties to the proceedings, and determine and assess[,] . . . if the property sought to be condemned constitutes only a part of a larger parcel, the damages which will accrue to the portion not sought to be condemned by reason of its severance from the portion sought to be condemned and the construction of the improvement in the manner proposed by the plaintiff." UTAH CODE § 78B-6-511(1)(b).

---

of property where the taking or the construction of the improvement *on that part* causes injury to that portion of the parcel not taken.").

¶31 The first step in the analysis is straightforward: It is the factfinder (court, jury, or referee) who hears evidence and assesses the appropriate measure of damages to be awarded to the person from whom property is taken. That suggests that we, as an appellate court, should defer to the factfinder's determination so long as it is made in accordance with the correct legal standard.

¶32 The next step concerns the legal standard that the factfinder should use in awarding severance damages. The statute speaks to this question in providing for severance damages "to the portion not sought to be condemned by reason of its severance from the portion sought to be condemned and the construction of the improvement in the manner proposed by the plaintiff." *Id.* Under this provision, severance damages are limited to damages caused "by reason of" (1) the severance itself and (2) construction of the proposed improvement.

¶33 The first category is straightforward—and is not before us in this case. Damages caused by the "severance from the portion sought to be condemned" are damages resulting from severance that itself devalues the remaining property. If UDOT condemned an entire shopping center but left the mall's parking lot intact, the value of the remaining property (the parking lot) would probably be greatly diminished because the parking lot would no longer be connected to and service a mall. It would likely simply be a large empty lot.

¶34 The second category is more difficult. The question of the scope of damages caused "by reason of" the "construction of [an] improvement in the manner proposed by the plaintiff" is the central focus of the dispute in this case. And this question has eluded elucidation in our prior cases.

¶35 We turn to this question in the paragraphs below. We first present evidence of the original meaning of the term "improvement." We then explain that the meaning of this term opens the door to an award of severance damages flowing from any amelioration of the condition of land that is to be completed at or near the time of the taking and that serves the same purpose

for which the severed property was taken (and not some independent purpose unrelated to the condemnation).[5]

### a. Defining *improvement*

¶36 We start by looking to the original meaning of "improvement." This statutory language can be traced back to the Utah Territorial Code in 1888. *See* COMPILED LAWS OF UTAH § 3851(2) (1888). At around the time the law was written, "improvement" was defined as "[a]n amelioration in the condition of real or personal property effected by the expenditure of labor or money for the purpose of rendering it *useful for other purposes* than those for which it was originally used, *or more useful for the same purposes*." *Improvement*, BOUVIER'S LAW DICTIONARY (15th ed. 1892) (emphases added). It included "repairs or addition[s] to buildings, and the erection of fences, barns, etc." *Id.* So the term "improvement" as originally understood encompassed a wide range of beneficial alterations to land that rendered the land either useful for new purposes or more useful for its original purposes.

¶37 Severance damages are thus available if they flow from any amelioration in the condition of the land—from any construction "effected by the expenditure of labor or money for the purpose of rendering it *useful for other purposes* than those for which it was originally used, *or more useful for the same purposes*." *Id.* (emphases added). This definition suggests a focus on the "purpose" of the amelioration of the land. Any and all aspects of a given "improvement" are included so long as they materially advance the "purpose" of the condemning authority.

### b. Explaining *improvement*

¶38 Our clarified statutory standard captures this focus by tying the boundaries of the compensable "improvement" to the

_____

[5] For example, sound walls along a freeway could serve a purpose independent of the freeway entrance itself (such as blocking sound from the interstate). On the other hand, the widening of a highway might necessitate the moving of a parallel frontage road. In the first case, the sound walls might not serve the same purpose for which land was seized—the building of a freeway entrance. In the latter case, the purpose for the taking would still be to widen the highway.

*purpose* for the severance of the land. Looking to the governing statutory language, which defines improvement by reference to the condemning authority's proposal ("in the manner proposed"), our clarified standard also defines the relevant purpose by referring the factfinder to the condemnation proposal in question.[6] Because a condemning authority may take property only for an actual public use,[7] the purpose in the proposal must be a legally viable one.

¶39 Our clarified standard also takes into account the fact that "improvement" is singular rather than plural. The statute thus requires that compensable alterations to land be completed at or

---

[6] The statutory scheme does not require a formal proposal for condemnation, but it does require the condemning authority to file a complaint to initiate eminent domain proceedings before the court. *See* UTAH CODE § 78B-6-507. And the statutory scheme also requires that "[b]efore property can be taken it must appear that: (a) the use to which it is to be applied is a use authorized by law [and] (b) the taking is necessary for the use." *Id.* § 78B-6-504(1)(a)– (b). Additionally, the statute requires the factfinder to calculate severance damages caused by "the construction of the improvement in the manner proposed by the plaintiff." *Id.* § 78B-6-511(1)(b). This suggests that we may identify the proposal "in the manner proposed by the plaintiff" by looking to the condemning authority's evidence and arguments in support of its decision to take the property and in describing the use to which the property will be put. The ultimate determination of what the relevant "improvement" is will fall to the factfinder, who will render its decision based on the condemning authority's assertions about the use to which the property will be put. The owner's participation in the litigation process will help keep the condemning authority honest and curtail the condemning authority's ability to craft an artificially narrow purpose for the relevant proposed improvement. But ultimately, it is the factfinder that will police the relationship between the taken parcel and the compensable improvement.

[7] *See* U.S. CONST. amend. V ("[N]or shall private property be taken for public use, without just compensation."); UTAH CONST. art. I, § 22 ("Private property shall not be taken or damaged for public use without just compensation.").

near the time of the taking. The governing timeframe is a fact-intensive question to be resolved on a case-by-case basis, but the legal standard nonetheless imposes some limits. Severance damages would not be available, for example, for an improvement proposed long after the initial condemnation and severance, even if the addition furthered the same purpose as the initial condemnation. So today's claimants would not be entitled to severance damages stemming from a future reconstruction of the interchange absent an additional taking because that would be a new improvement made in a new and distinct "proposal."

¶40 Our revised statutory standard thus forecloses a position advanced here by UDOT—the notion that "improvement" should be read narrowly to encompass only the portion of any improvement that the condemning authority builds *on the property taken from the owner*. UDOT's proposed line has the virtue of being a bright one. And we would certainly enforce it if it were the standard set forth in the statute. But we see no way to reconcile UDOT's proposed line with the statutory text.

¶41 UDOT used a portion of the claimants' land to build a berm that provided a foundation of support for the Main Street Interchange in American Fork. And UDOT has asked us to limit the claimants' severance damages to the damages flowing from the construction of this berm. But that approach cannot be reconciled with the governing terms of the statute. A berm in and of itself is not an "improvement" that would serve a public purpose that UDOT is authorized to fulfill. UDOT's condemnation authority is limited to the taking of property "for temporary, present, or reasonable future state transportation purposes." UTAH CODE § 72-5-103. So the relevant "improvement" here is not the berm in isolation. It is the broader interchange, of which the berm is a component part—a part that is aimed at fulfilling the same transportation purpose.

¶42 Thus, the relevant "improvement in the manner proposed" by UDOT is not the berm in isolation, or the severed portion of the improvement that was built on the claimants' property. This follows from the fact that UDOT lacks statutory authority to take property for the bare purpose of building berms. UDOT is not in the business of building isolated berms, just as the city of American Fork is not in the business of building a single wall of a police station. So a proposal to do either would not legitimately define the improvement's scope.

### 3. Affirming the Court of Appeals

¶43 With the above in mind, we repudiate the standards in our precedent that frame the severance damages inquiry in terms that turn on the identification of the relevant "structure" or on a determination whether the severance was in some sense "essential to the project as a whole." Those inquiries are too divorced from the statutory text, and too confused and ill-defined, to be controlling. And for the same reasons we also disagree with the structure-based approach adopted by the court of appeals in this case.[8]

¶44 That said, we nonetheless affirm the court of appeals' decision on the merits for two reasons. First, because we reject the "essential to the project as a whole" test, we conclude that there was no error in the court of appeals' refusal to require the claimants to satisfy that test. Second, the court of appeals' focus on causation, in conjunction with the jury instructions before the district court, did the heavy lifting required under the clarified statutory standard we adopt today. Thus, while the court of appeals spoke in terms of a presumption of damages caused by a structure, it reached a result that is consistent with the statute. So although we reject the presumption endorsed by the court of appeals, we affirm its ultimate decision to uphold the jury verdict entered in this case.

¶45 In granting *certiorari*, we agreed to take up the question of whether the court of appeals erred in concluding that the claimants did not need to prove that their severed property was essential to either highway project as a whole. In past cases, we had used the "essential to the project as a whole" test in an attempt to clarify what was required to recover damages caused by improvements related to takings but constructed off the taken parcels. *See Admiral Beverage Corp.*, 2011 UT 62. This case presented a situation not clearly addressed by our prior cases—

---

[8] This is no knock on the court of appeals. As a lower court, it was stuck with our precedent as it stood. Only we are in a position to revise and reformulate it. And in any event the court of appeals' careful analysis was helpful in highlighting some of the deficiencies in our case law that prompted our attempt at clarification and repudiation.

what to do when the relevant improvement is only partially constructed on the taken parcel.[9] That led to the question whether the "essential to the project as a whole" test applied in a case like this one. Because we reject that test as contrary to the plain language of the statute, we conclude that the court of appeals did not err in deciding that the claimants need not satisfy that test.

¶46 Beyond the fact that there was no error in refusing to require proof that the severance was somehow "essential to the project as a whole," we conclude that the court of appeals reached a result consistent with the standard we clarify today—despite speaking in terms that we reject in this opinion. Our clarified standard allows for severance damages caused by a proposed improvement to the condition of land that (1) is to be completed at or near the time of the taking and (2) serves the same purpose for which the severed property was taken—*i.e.*, damages caused by the "construction of the improvement in the manner proposed."

¶47 At trial, the jury was not instructed according to this standard. It was instructed (in accordance with our law as it stood at the time of trial) that it could award severance damages in two situations. First, the jury could award severance damages for "any loss of fair market value to the remaining property caused by the taking and/or by the construction of the highway projects on the property taken." Second, it could award "damages caused by an improvement that is built on property other than that which was taken if the use of the property taken was essential to the completion of one or the other of the highway projects as a whole."

¶48 The jury verdict included damages caused by both onsite and offsite[10] UDOT construction activities near the time of the

---

[9] *Utah State Road Commission v. Miya* seemed to address this situation. 526 P.2d 926 (Utah 1974). But *Miya* is inconsistent in its statement of the background facts. *See infra* ¶ 55 n.12. And it is thus impossible to tell from our opinion in *Miya* whether any or part of the relevant improvement was actually constructed on property taken from the owner.

[10] We use the terms "onsite" and "offsite" to differentiate between UDOT's construction activities on the taken property and

(continued . . .)

taking. This result comports with our clarified statutory standard. This is true whether or not the jury decided to award damages under the first or second prong because the jury ultimately awarded damages caused by UDOT's construction of an improvement at or near the time of the taking that served the same purpose as the taking. In other words, the taking was causally connected to the construction of the interchange.

¶49 As the condemnation proceedings clarified, UDOT's purpose in condemning the claimant's property was to construct an earthen berm to support a new freeway interchange that connected its two highway projects.[11] The interchange was constructed near the time of the taking (UDOT filed its condemnation action in 2009 and construction on the interchange improvement began in 2010). So UDOT took the property near the time of the construction of the interchange improvement for the construction thereof. And the jury's decision to award compensation for damages caused by the entire interchange was appropriate under our clarified statutory standard.

¶50 Whether the jury decided to award severance damages under prong one or prong two of the instruction, it determined that there was a causal nexus between the taking and the onsite and offsite construction activities to make damages arising from those activities compensable. Causation goes to the heart of the statute, which allows for recovery of severance damages caused

---

its other construction activities; thus the "site" to which we are referring is the taken property.

[11] The condemnation complaint originally filed by UDOT said that the property would be used for "state transportation purposes" in connection with its widening of the I-15 Corridor in Utah Valley and the construction of the Pioneer Crossing Highway. Because the actual use of the property and its relation to other UDOT activities was not clear from the face of the complaint, the claimants indicated that they did not have sufficient evidence to admit or deny UDOT's allegation and requested a jury trial. UDOT's intent to use the property to pile up dirt in order to support a new interchange became clear over the course of litigation. In light of the evidence of this use, the jury decided to award damages stemming from the entire interchange's impact.

"by reason of . . . construction of the improvement in the manner proposed." UTAH CODE § 78B-6-511(1)(b). For these reasons, it would be futile to remand this case for a new trial in which a new jury would be required to conduct another causation analysis. The jury was not instructed on the law as clarified in our opinion in this case. But the clarifications we make would not have changed the jury verdict.

¶51 The court of appeals' causation analysis also allows us to affirm without endorsing its presumption framework. The court of appeals upheld the jury verdict because it held that when part of a structure such as the interchange is built on severed property, the owner is presumptively entitled to severance damages caused by the entire view-impairing structure, including damages caused by the offsite components of the structure. Like the jury, the court of appeals focused on the causal link between the taking and the onsite and offsite construction activities of UDOT. Because causation is a key component of our section 78B-6-511(1)(b) analysis, we affirm the court of appeals' decision to uphold the jury verdict in this case. As the court of appeals' decision clearly demonstrates, the interchange was a proposed improvement—an amelioration or alteration to the condition of land—that was closely related to UDOT's decision to take property from the claimants (part of the interchange was built on the claimants' property). As with the jury verdict, this determination of a close causal connection satisfies the statute's requirements.

¶52 The new interchange was an alteration to the condition of land that made the land more useful for its previous use. It was also an alteration to additional land that had not been previously used as part of the interchange, which thus made that land useful for a new purpose. The litigation process revealed that UDOT's proposed use for the property severed from the claimants' parcel was to build the new interchange. Thus, the severed property was taken to serve the same purpose for which UDOT was conducting its offsite alterations to land and the jury properly awarded severance damages caused by those alterations. The court of appeals properly affirmed the jury's decision to award compensation for damages stemming from the entire interchange because the jury reached a result that comports with what is required under the statute. At most there was an error in the jury instruction, which UDOT did not object to. And that error did not result in an award of severance damages contrary to those

contemplated by the statute. In these circumstances we see no problem in affirming the court of appeals' decision on the merits.

### 4. Reconciling the Results of Our Precedents

¶53 The above may suggest that our decision today results in the overruling of a line of our prior precedent. And "[w]e do not lightly overrule our prior opinions." *Admiral Beverage*, 2011 UT 62, ¶ 16 (citation omitted). But our repudiation of the dicta in our past opinions does not mean that we disagree with the ultimate holdings. Indeed, the framework we establish today can be reconciled with the judgments rendered in our past cases. We have previously overruled some of our older cases in this area. And our decision today is in line with the outcomes rendered in our more recent cases.

¶54 We turn first to two cases UDOT relies on extensively— *State v. Harvey Real Estate*, 2002 UT 107, 57 P.3d 1088, and *Utah Dep't of Transp. v. D'Ambrosio*, 743 P.2d 1220 (Utah 1987). UDOT argues that these cases prevent the claimants from recovering severance damages. We disagree. True, both cases suggest that it is the property line that defines the contours of what is compensable under the governing statute. *See Harvey Real Estate*, 2002 UT 107, ¶ 10 (holding that the severance damages statute "gives a landowner the right to present evidence of damages caused by the construction of the improvement made on the severed property[,]" not "the right to present evidence of damages caused by other facets of the construction project"); *D'Ambrosio*, 743 P.2d at 1222 ("Severance damages are those caused by the taking of a portion of the parcel of property where the taking or the construction of the improvement *on that part* causes injury to that portion of the parcel not taken."). But the strict standards set forth in these cases were repudiated by this court in *Ivers*, 2007 UT 19, ¶ 20. There, we held that "these cases should not be read . . . to hold that the only situation in which a partial condemnation can cause awardable severance damages is when the view-impairing structure is built directly on the severed land." *Id.* Thus, we may properly disregard the language in *Harvey Real Estate* and *D'Ambrosio* because our court has previously held that severance damages are not limited to those stemming from activities within the original property lines.

¶55 We next address the case the court of appeals relied on— *Miya*, 526 P.2d 926 (Utah 1974). In that case, we stated that severance damages were appropriate for "the loss of view

occasioned by a proposed public structure to be erected, in part at least upon a parcel of property taken by condemnation from a unit of property." *Id.* at 929 (citation and internal quotation marks omitted). The court of appeals read this case to support its presumption—a presumption that we now view to be inconsistent with the governing statute. But *Miya* does not mandate the presumption used by the court of appeals.[12] And the quoted *Miya* language is captured by the test that we outline today. Where the proposed improvement is partially located on the taken parcel, a party is entitled to severance damages stemming from the improvement if it qualifies as the "improvement in the manner proposed." In a case like the one now before us, no presumption is necessary, and the scope of the relevant proposed improvement is simply a question for the factfinder to consider under our clarified statutory test.

¶56 Similarly, the outcomes in *Ivers* and *Admiral Beverage* also comport with the test we adopt today. While we reject the way those cases have framed the section 78B-6-511(1)(b) inquiry, their results are consistent with the clarified statutory standard in this case.

¶57 *Ivers* and *Admiral Beverage* were both based on similar fact patterns[13] and applied the same legal framework—the one established in *Ivers*. Under that framework, severance damages were appropriate (1) when the condemning authority "builds a

---

[12] We also note that *Miya*'s precedential value is undermined by the potentially contradictory facts stated therein. The opinion initially says that the state condemned .66 acres of property. *Miya*, 526 P.2d at 927. But it later suggests that only .16 acres were condemned, which would suggest that the improvement (a viaduct) was not constructed even partially on taken property. *See id.* at 928. This contradiction makes it impossible to say whether our cases have directly addressed the factual scenario presented in this case.

[13] In both cases, the court was dealing with highway expansion and elevation projects that required the construction of parallel frontage roads on taken parcels. *See Utah Dep't of Transp. v. Admiral Beverage Corp.*, 2011 UT 62, ¶ 2, 275 P.3d 208; *Ivers v. Utah Dep't of Transp.*, 2007 UT 19, ¶ 1, 154 P.3d 802.

view-impairing structure directly on [the taken] land," *Ivers*, 2007 UT 19, ¶ 20, or (2) "[w]hen land is condemned as part of a single project—even if the view-impairing structure[14] itself is built on property other than that which was condemned—if the use of the condemned property is essential to the completion of the project as a whole," *id.* ¶ 21 (footnote added).

¶58 As discussed above, *supra* Part II.A.1, the *Ivers* test is problematic because it replaces the statutory terminology of "improvement" with an inquiry into the nexus between the severance of a landowner's property and the condemning authority's entire project. But despite this departure from the statutory text, the ultimate holding in *Ivers* and *Admiral Beverage*—that a property owner may be entitled to severance damages caused by offsite construction in some cases—is consistent with our decision today.

¶59 Our clarified definition of "improvement in the manner proposed" is broad enough to encompass offsite alterations to land such as the ones in *Ivers* and *Admiral Beverage* so long as they qualify as parts of "the improvement in the manner proposed." In those cases, the relevant improvement included both the condemning authority's construction of the frontage roads on the taken parcels as well as its alterations to the parallel highways. Both the onsite and offsite components of the relevant improvement in each case consisted of alterations to land that were completed at or near the time of the condemnation of each owner's property and that served the same purpose as the taking—in both cases, the purpose of enlarging the nearby highway. We therefore disavow the "essential to the project as a whole" test. But we need not overrule the ultimate judgment in either *Ivers* or *Admiral Beverage* because the decisions in these cases at least arguably are in line with the clarified statutory standard we set forth here.

¶60 Finally, we speak briefly to the central holding in *Admiral Beverage*—that once a taking is established, an owner is entitled to full compensation in the form of market-value diminution. 2011 UT 62, ¶ 43. In its briefing, UDOT questioned the scope of

---

[14] *Admiral Beverage* used the statutory term "improvement" rather than "structure." 2011 UT 62, ¶ 29.

market-value damages available to an owner seeking severance damages. It pointed to language in *Admiral Beverage* that it viewed as contradictory on this point. In that opinion, we said both that "in assessing fair market value in the context of severance damages we have *always* allowed evidence of all factors that affect market value," *id.* ¶ 17, and that an owner is only "entitled to severance damages amounting to the full loss of market value in his remaining property *caused by the taking*," *id.* ¶ 19 (emphasis added). UDOT asked us to clarify whether the factfinder should consider all factors affecting market value or only those caused by the taking in conducting its section 78B-6-511(1)(b) analysis. Recognizing that this language could be read as contradictory, we now clarify that the latter quoted language governs the scope of available severance damages. We reach this conclusion by focusing on the language of the statute.

¶61 Under section 78B-6-511(1)(b), a property owner is entitled to severance damages caused "by reason of its severance from the portion sought to be condemned and the construction of the improvement in the manner proposed by the plaintiff." The language from *Admiral Beverage* limiting market value damages to those "caused by the taking," 2011 UT 62, ¶ 19, clearly governs because the statute expressly limits the damages available to those caused "by reason of . . . severance . . . and the construction of the improvement," UTAH CODE § 78B-6-511(1)(b). Consequently, when a diminution in property value arises from some state or private action unrelated to the relevant improvement and severance, the claimant is not entitled to damages for that diminution.

### B. Adequacy of the Briefing on Sound Walls

¶62 The court of appeals determined that UDOT failed to adequately brief its challenge to the availability of severance damages arising from the construction of certain sound walls. It held that "[t]his argument was not well-developed in UDOT's briefing, and as a result we are not certain exactly which 'sound walls' UDOT is referring to or where they are located, or whether UDOT is even attempting to argue that the sound walls in question are not part of the Interchange." *Utah Dep't of Transp. v. Target Corp.*, 2018 UT App 24, ¶ 36 n.10, 414 P.3d 1080. We disagree that the lack of location information made the briefing inadequate. The question under the statute is not merely one of proximity. The statute deals with the relationship between the offsite construction activities and the condemnation of the severed

property—whether the sound walls qualified as part of the compensable "improvement in the manner proposed." While proximity may be an important factor in measuring that relationship, it is certainly not the end-all, be-all.

¶63 For that reason we disagree with the court of appeals to the extent it faulted UDOT for not pinpointing the location of the offsite sound walls in its briefing. Yet we nonetheless agree that UDOT's briefing was inadequate because UDOT didn't make clear whether it was "even attempting to argue that the sound walls . . . [were] not part of" the improvement in question. *Id.*

¶64 UDOT's briefing regarding the sound walls was inadequate in light of the procedural posture of this appeal. At trial, the jury was instructed that it could award severance damages in two situations. First, it could award severance damages for "any loss of fair market value to the remaining property caused by the taking and/or by the construction of the highway projects on the property taken." Second, it could award severance damages for "damages caused by an improvement that is built on property other than that which was taken if the use of the property taken was essential to the completion of one or the other of the highway projects as a whole." The jury then awarded severance damages in a general verdict that did not specify whether it had awarded severance damages under the first or second prong of the instruction.

¶65 The jury verdict form in question segregated the severance damages from the value of the taken property. But the form did not identify which route the jury took in awarding severance damages. And because the jury was given two alternative grounds for an award of severance damages, we are left with what is effectively a general verdict as to severance damages. This is fatal to UDOT under our case law, which holds that we "affirm if there is even one valid basis upon which the jury could have" entered a general verdict. *SIRQ, Inc. v. Layton Cos.*, 2016 UT 30, ¶ 51, 379 P.3d 1237.

¶66 Where a general verdict is entered and an appellant challenges only one basis for the verdict and fails to address an independent ground, the general verdict stands. In such circumstances the appellant's briefing is inadequate. And that is precisely the problem here.

¶67 The jury instruction left the jury two permissible routes by which to award severance damages—(1) for a "loss of fair

market value to the remaining property" caused by "the construction of the highway projects on the property taken," or (2) for "damages caused by an improvement that is built on property other than that which was taken if the use of the property taken was essential to the completion of one or the other of the highway projects as a whole." Yet UDOT's sound wall argument focused only on the second of those two grounds. In challenging the award of severance damages resulting from the sound walls, UDOT asserted only that the claimants had failed to show that the taken parcel was essential to either of the broader highway construction projects. It therefore failed to challenge the alternative basis for the jury verdict, leaving us with no choice but to affirm the general verdict.

¶68 Under prong one of the relevant instruction, severance damages were available for "any loss of fair market value to the remaining property caused by the taking and/or by the construction of the highway projects on the property taken." This prong closely parallels the language of the test that we adopt today. While we reject the use of the term "project" as more confusing than helpful, *see supra* ¶ 43, this jury instruction can easily be read to allow for severance damages arising from UDOT's proposed improvement despite its use of "project." And if the jury awarded severance damages for the sound walls based on its determination that the sound walls were part of the relevant improvement (which we assume it did under the general verdict rule), then we may uphold the verdict because UDOT neither objected to the jury instruction nor advanced a challenge to the instruction on appeal. We affirm on that basis.

¶69 UDOT's briefing falls short because it fails to refute this possible ground for the jury verdict. By challenging only one ground for the jury verdict, UDOT leaves intact a sufficient, alternative basis for the award of severance damages.

## III. CONCLUSION

¶70 The legislature has enacted a statutory scheme that strikes a balance between the rights of private property owners and the interests of the public in condemnation proceedings. This balance is a product of the time in which the governing statute was enacted—the late 1800s, when takings law underwent a shift in favor of private property rights at the taxpayers' expense. As some of our past cases have suggested, we, as judges, might opt for a more constrained approach to severance damages—a cleaner

line that would limit compensation to actions taken by the condemning authority on the property actually taken. *See State v. Harvey Real Estate*, 2002 UT 107, ¶ 10, 57 P.3d 1088 (holding that the severance damages statute "gives a landowner the right to present evidence of damages caused by the construction of the improvement made on the severed property[,]" not "the right to present evidence of damages caused by other facets of the construction project"). But we do not think it appropriate for us to second-guess the balance struck by the legislature.[15] We accordingly reemphasize the importance of the terms of the statute as originally understood. And we clarify the operative test that is required by those terms. Because we believe that the result reached by the court of appeals comports with that clarified statutory standard, we affirm.

––––––––––––

[15] *But see Utah Dep't of Transp. v. Admiral Beverage Corp.*, 2011 UT 62, ¶¶ 1, 19, 275 P.3d 208 (suggesting that the Utah Takings Clause may impose similar limits on the legislature's authority in this sphere; holding, based on the state constitution in conjunction with our case law and state statutes, that a landowner whose property is severed is "entitled to severance damages amounting to the full loss of market value in his remaining property *caused by the taking*" (emphasis added) (footnote omitted)).