*This opinion is subject to revision before final publication in the Pacific Reporter*

**2020 UT 16**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

KEVIN BLANKE,
*Petitioner*,

*v.*

UTAH BOARD OF PARDONS AND PAROLE,
*Respondent*.

No. 20160766
Heard October 7, 2019
Filed April 16, 2020

On Certiorari to the Utah Court of Appeals

Third District, Salt Lake
The Honorable Ryan M. Harris
No. 150902967

Attorneys:

Cory A. Talbot, Christopher D. Mack, Salt Lake City, for petitioner

Sean D. Reyes, Att'y Gen., Brent A. Burnett, Asst. Solic. Gen.,
Amanda N. Montague, Asst. Att'y Gen., Salt Lake City, for
respondent

JUSTICE HIMONAS authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, JUSTICE PEARCE, and JUSTICE PETERSEN
joined.

ASSOCIATE CHIEF JUSTICE LEE filed a concurring opinion.

JUSTICE HIMONAS, opinion of the Court:

## INTRODUCTION

¶1 The Utah Board of Pardons and Parole declined to set a parole date for Kevin Blanke, a Utah prison inmate, because he refused to participate in the prison sex offender treatment

1

program. Blanke is serving a prison sentence for his convictions of attempted child kidnapping and kidnapping. Because of the attempted child kidnapping conviction, Blanke is considered a sex offender under Utah's sex offender registration statute. In addition, at the time he was sentenced for kidnapping, Blanke admitted in his presentence report to having sexual intercourse with a fifteen-year-old, conduct that would also place him, if he were convicted of it, on the sex offender registry. The question presented is whether under these circumstances the Parole Board must afford an inmate the due process protections required in *Neese v. Utah Board of Pardons and Parole*, 2017 UT 89, 416 P.3d 663. We hold that *Neese* does not require it to do so.

## BACKGROUND

¶2   Blanke is currently incarcerated for two crimes. He pleaded guilty in 2002 to attempted child kidnapping and received a prison sentence of three years to life. At that time, any person convicted of attempted child kidnapping had to register as a sex offender. *See infra* ¶ 28 n.13. One year later, Blanke pleaded guilty to kidnapping and received a prison sentence of one to fifteen years for that crime. The two convictions arose from separate incidents—one in 2002 and the other in 1997. The presentence reports in the two cases reflect the following factual bases for the charges.[1]

¶3   The attempted child kidnapping charge arose from events in 2002 involving a child, Elisabeth.[2] Blanke had come across Elisabeth and her older sister one day while the two were playing near a park. Elisabeth crossed the street to talk to Blanke after he called her over, and then she returned to her older sister, saying Blanke had offered to pay them if they would go with him. Her sister declined the offer and returned home, but Elisabeth left with Blanke. Blanke subsequently drove Elisabeth in his truck to get ice cream. When she got scared and told him that she wanted

_____

[1] This is an appeal from an order granting summary judgment for the Parole Board and so we summarize the facts in the light most favorable to Blanke. *Neese v. Utah Bd. of Pardons & Parole*, 2017 UT 89, ¶ 2 n.1, 416 P.3d 663.

[2] For the attempted child kidnapping victim and the kidnapping victim, we use fictional names to protect their privacy and for ease of reference.

to go home, he dropped her off at the park. She had been gone for about an hour and a half. Upon her return, Elisabeth was taken to the hospital. An examination revealed no physical appearance of abuse, and Elisabeth did not claim that she was physically harmed.

¶4    The kidnapping charge sprang out of an incident in 1997 involving a fifteen-year-old, Michelle. The presentence report says that Blanke—forty-three years old at the time—had given Michelle and her friend a ride and smoked marijuana with them. Soon after her friend left, Michelle decided to leave as well. But Blanke followed her, handed her a threatening note, and demanded that she get in his truck. He then pushed her inside, telling her that he had a gun. Blanke subsequently drove Michelle to another location and allegedly "raped and sodomized her."[3] Blanke described the incident in his statement in the presentence report: "I got aroused and we had sex. I did not know that she was underage until three days later when I talked to the police."

¶5    At the sentencing hearing for his kidnapping conviction, Blanke's counsel objected to the presentence report's statement that Blanke had "raped and sodomized" Michelle. But counsel did not object to anything else in the presentence report, including the statement that Blanke had sex with a fifteen-year-old. After Blanke's counsel raised that objection, Michelle testified. She said Blanke had "terrorized" and "raped" her. When she finished, the court asked Blanke if he had anything to say. He simply replied, "That's all right, your Honor. I'll just be sentenced and just do my time."

¶6    Blanke's original parole-grant hearing took place in 2006. There, the hearing officer asked Blanke whether he had had "sexual intercourse with" and "basically raped" Michelle. Blanke replied that yes, he had.[4] Then, Elisabeth's father testified,

_____

[3] Blanke was never charged with rape. Although Michelle reported the rape and Blanke was identified as a suspect, the case "fell through the cracks." By the time Blanke was arrested in 2002, the statute of limitations for rape had expired.

[4] Blanke later said this was a false confession. He claimed that he admitted to raping Michelle only because he "was told by every inmate [he] talked to before [his] 2006 Board Hearing, that a

(continued . . .)

alleging that Blanke had kidnapped Elisabeth with the intent to sexually abuse her, which Blanke denied.

¶7    After Blanke's first hearing, the Parole Board did not set a release date and instead scheduled a rehearing. That rehearing, which is the most relevant hearing to this appeal, took place in 2012. The hearing officer first asked Blanke about the incident with Elisabeth, noting her father's 2006 testimony. Before moving on, the hearing officer asked if Blanke wanted to convey any other information to the Parole Board, and he said, "No sir." And then, just like at the first hearing, the hearing officer inquired about the rape accusation. This time, however, Blanke responded that he did not want to answer that question. He said that he was "never charged" with and "never pled guilty" to rape and that he "believe[d] that the board [had] all the information necessary to . . . [m]ake a decision on that case." He also said that he did not believe he was a sex offender. Then, Blanke was allowed to say anything else he wanted to about the kidnapping case; he said that he had nothing to add.

¶8    Concluding the hearing, the hearing officer said that he did not know what the Parole Board's decision on Blanke's parole eligibility would be. He then said that he personally "wouldn't consider any kind of release" until Blanke had been through sex offender treatment. He believed that Blanke "kidnapped [Elisabeth] with the intent of sexually abusing her" and "brutally raped [Michelle]."

¶9    After the 2012 hearing, Blanke was denied a release date yet again. The Parole Board instead scheduled a rehearing for 2032 and ordered a sex offender treatment memorandum. In its written decision, the Parole Board cited some aggravating and mitigating factors but contained no other explanation for its refusal to set a parole date.

¶10 Almost three years later, Blanke filed a petition for extraordinary relief under rule 65B(d) of the Utah Rules of Civil Procedure. Among other things, he alleged that the Parole Board had violated due process by conditioning his parole on completion of sex offender treatment even though he had not committed a sex offense. The district court granted summary

---

negative answer to a Board question would result in a denile [*sic*] of parole."

judgment for the Parole Board on all claims, holding that the Parole Board did not violate Blanke's due process rights by requiring a sex offender treatment memorandum to be filed before the next hearing. The court of appeals affirmed, and Blanke filed a petition for certiorari with this court.

¶11 We provisionally granted Blanke's petition, pending our decision in *Neese v. Utah Board of Pardons and Parole*, 2017 UT 89, 416 P.3d 663. After we issued our decision in *Neese*,[5] we lifted the provisional qualifier and presented the following issue for review: whether the Parole Board must comply with the due process standards set out in *Neese* under the circumstances of this case.[6]

_____

[5] Blanke received another rehearing in 2018, after we issued our decision in *Neese*. There, Blanke flatly denied raping Michelle. He also said he could not participate in sex offender treatment because of his pending lawsuit. The Parole Board again declined to set a parole date. Instead, it set a rehearing for 2024 and indicated it "may consider an earlier release if Mr. Blanke completes Sex Offender Treatment Program."

[6] The concurrence would have us "repudiate *Neese*." *Infra* ¶¶ 48, 52. The parties, however, have not asked us to do so, nor have we ordered supplemental briefing on the matter, which is our preferred practice if we are considering overturning or reformulating precedent. *See, e.g., Utah Dep't of Transp. v. Target Corp.*, 2020 UT 10, ¶ 18, --- P.3d ---; *State v. Lujan*, 2020 UT 5, ¶ 3, --- P.3d ---. And although we have the power to revisit precedent at any time, we are extremely reluctant to do so without invitation from the parties and without briefing. *See Neese*, 2017 UT 89, ¶ 59 (providing that we "ought not upend our precedents absent argument from the parties that they be overruled"); *State v. Rowan*, 2017 UT 88, ¶ 23, 416 P.3d 566 (Himonas, J., concurring) ("But having discretion [to decide any issue] is not the same as prudently exercising it."). Of course, as the concurrence suggests, we are free to order supplemental briefing at any time. But we have declined to do so here because, unlike the concurrence, we do not doubt the viability of *Neese*. And we are also free, as the concurrence suggests, to "clarify, refine, or reconcile our past precedent." *Infra* ¶ 85; *Rutherford v. Talisker Canyons Fin., Co., LLC*, 2019 UT 27, ¶ 79 n.27, 445 P.3d 474 ("[W]e are always free to clarif[y] ambiguities in past opinions without overruling their holdings." (second alteration in original) (citation omitted)

(continued . . .)

¶12 We have jurisdiction under Utah Code section 78A-3-102(3)(a).

## STANDARD OF REVIEW

¶13 On certiorari, we review the court of appeals' decision and not that of the district court. *State v. Harker*, 2010 UT 56, ¶ 8, 240 P.3d 780. And we review the decision of the court of appeals for correctness, without any deference to its conclusions of law. *Id.* Of course, in determining whether the court of appeals erred, we must be cognizant of the procedural backdrop against which the issue arose. Here, the district court granted the Parole Board's motion for summary judgment on Blanke's due process claim. The ultimate due process question is an issue of law to be reviewed for correctness. *Neese v. Utah Bd. of Pardons & Parole*, 2017 UT 89, ¶ 21, 416 P.3d 663. Typically, "[w]hen a due process question requires 'application of facts in the record to the due process standard, we incorporate a clearly erroneous standard for the necessary subsidiary factual determinations.'" *Id.* (quoting *Salt Lake City Corp. v. Jordan River Restoration Network*, 2012 UT 84, ¶ 47, 299 P.3d 990). On summary judgment, however, "all factual inferences must be drawn in favor of the nonmoving party as a matter of law, and we therefore review an award of summary judgment on a due process issue only for correctness." *Id.* (citing *Rupp v. Moffo*, 2015 UT 71, ¶ 5, 358 P.3d 1060).

¶14 Assuming, however, Blanke could establish that the district court erred in granting summary judgment to the Parole Board on his due process claim, he would be only "eligible for, but not entitled to, extraordinary relief." *State v. Barrett*, 2005 UT 88, ¶ 24, 127 P.3d 682; UTAH R. CIV. P. 65B(d)(2)(D) ("Appropriate relief *may* be granted . . . where the Board of Pardons and Parole has exceeded its jurisdiction or failed to perform an act required by constitutional or statutory law." (emphasis added)). And when deciding whether to grant the relief sought in a rule 65B(d) petition, a court "will consider multiple factors" such as "the

_____

(internal quotation marks omitted)). That is exactly what we are doing here—refining *Neese* and holding that it does not extend to Blanke's situation. Bottom line: the concurrence has been and remains more willing than the other members of this court to uproot precedent. And to be clear, the concurrence's view when it comes to the proper role of *stare decisis* is principled and consistent. But so is the view of the other members of this court.

egregiousness of the alleged error, the significance of the legal issue presented by the petition, [and] the severity of the consequences occasioned by the alleged error." *Barrett*, 2005 UT 88, ¶ 24.

## ANALYSIS

¶15 Blanke was convicted of a crime that requires his registration as a sex offender and admitted in his presentence report to having sex with a fifteen-year-old. Still, he contends that the Parole Board must afford him the additional procedural protections discussed in *Neese v. Utah Board of Pardons and Parole*, 2017 UT 89, 416 P.3d 663,[7] before it can determine that he is a sex offender and condition his parole on sex offender treatment.

¶16 In support of his contention, Blanke argues that attempted child kidnapping is not a sex offense. He also urges that, even if attempted child kidnapping is a sex offense, the Parole Board did not base its decision on the attempted child kidnapping charge but instead on the uncharged allegations that Blanke raped Michelle and sexually abused Elisabeth.[8] These arguments are not persuasive.

¶17 For the reasons below, we hold that the Parole Board did not violate Blanke's due process rights when—without using the procedures set out in *Neese*—it found that he was a sex offender and thus conditioned his parole on sex offender treatment. Due process does not require those procedures when an inmate has

---

[7] We required the Parole Board to use three additional procedural protections in *Neese*: "(1) timely, particularized written notice that allegations [inmates] committed unconvicted sexual offenses will be decided; (2) the opportunity to call witnesses [unless the safe administration of the prison system requires otherwise]; and (3) a written decision adequately explaining [the Parole Board's] basis for determining that [inmates are] sex offenders and asking them to participate in sex offender treatment." 2017 UT 89, ¶¶ 1, 43.

[8] Blanke also urges us to follow the Kentucky Supreme Court's decision in *Ladriere v. Commonwealth*, 329 S.W.3d 278 (Ky. 2010). That decision, however, is not on point because the issue in that case was whether ordering a defendant to complete sex offender treatment was authorized by a Kentucky statute. *Id.* at 281–82. We thus do not address it.

been convicted of—or, in a procedural setting like a sentencing hearing, has admitted to—a crime that requires him to register as a sex or kidnap offender.

## I. DUE PROCESS AT ORIGINAL PAROLE-GRANT HEARINGS

¶18 The Utah Constitution gives to the Parole Board power to "grant parole . . . subject to regulations as provided by statute." UTAH CONST. art. VII, § 12(2)(a). In general, "[d]ecisions of the board in cases involving paroles . . . are final and are not subject to judicial review." UTAH CODE § 77-27-5(3). This court has consistently held, however, that article I, section 7 of the Utah Constitution, which provides that "[n]o person shall be deprived of life, liberty or property, without due process of law," applies to original parole-grant hearings. *Neese v. Utah Bd. of Pardons & Parole*, 2017 UT 89, ¶ 23, 416 P.3d 663; *Labrum v. Utah State Bd. of Pardons*, 870 P.2d 902, 911 (Utah 1993); *see also Lancaster v. Utah Bd. of Pardons*, 869 P.2d 945, 947 (Utah 1994) (explaining that courts "review the fairness of the *process* by which the Board undertakes its sentencing function, but [they] do not sit as a panel of review on the result, absent some other constitutional claim, such as cruel and unusual punishment"). That is because Utah uses an indeterminate sentencing scheme. *Neese*, 2017 UT 89, ¶ 23. Under that scheme, the district court "impos[es] the statutorily prescribed range of years for the offense of conviction." *Id.* But then the Parole Board, using its "unfettered discretion," fixes the term of imprisonment within that range. *Id.* (quoting *Labrum*, 870 P.2d at 908). And because of that unfettered discretion, original parole-grant hearings are "analogous to sentencing hearings," requiring "due process to the extent that the analogy holds." *Id.* (quoting *Labrum*, 870 P.2d at 908).

¶19 Of course, due process does not require every procedural protection for every original parole-grant hearing. *See Labrum*, 870 P.2d at 911. Indeed, we have recognized that procedural rights in the parole-hearing context are "not unlimited." *Neese*, 2017 UT 89, ¶ 62; *Neel v. Holden*, 886 P.2d 1097, 1103 (Utah 1994) ("Just as the requirements of due process are limited in sentencing proceedings, so they are in parole hearings at which an inmate's predicted term of incarceration may be set."). Whether due process calls for the Parole Board to bolster an original parole-grant hearing with more procedural protections "depend[s] on the demands of the particular situation." *Neese*, 2017 UT 89, ¶ 24; *Labrum*, 870 P.2d at 911 ("The extent to which additional due process protections must be afforded inmates in this and other

proceedings in the parole system will require case-by-case review. Due process is flexible and calls for the procedural protections that the given situation demands." (citation omitted) (internal quotation marks omitted)). And "[p]recisely what due process requires of the board of pardons cannot be determined in the abstract, but must be determined only after the facts concerning the procedures followed by the board have been [fleshed] out." *Neel*, 886 P.2d at 1102 (second alteration in original) (citation omitted) (internal quotation marks omitted).

¶20 "[T]he touchstone of due process in the context of parole hearings is whether the proposed procedural due process requirement *substantially furthers* the accuracy and reliability of the Board's fact-finding process." *Id.* at 1103 (emphasis added). But we recognize that other factors play into the due process analysis as well. So, to help us decide what procedures the Parole Board must follow in each situation, "we balance the goals of (1) minimizing errors in the Parole Board's sentencing process and (2) promoting the perception of fairness with (3) ensuring the effective administration of Utah's prison and parole systems." *Neese*, 2017 UT 89, ¶ 53; *see also Labrum,* 870 P.2d at 909 ("At least two critical functions related to fundamental fairness are implicated by a petitioner's request for timely disclosure of information: minimizing error and preserving the integrity of the process itself."). We also strive to "promot[e] uniformity in sentences, reduc[e] the need for trials by encouraging rational plea bargains, and provid[e] incentives for good behavior in prison." *Neese*, 2017 UT 89, ¶ 24 (citation omitted) (internal quotation marks omitted).

¶21 Our opinions in *Neese* and *Labrum* provide examples of the procedural protections required in particular situations. In *Labrum*, the Parole Board withheld from an inmate notice of the "information used against him at the parole determination hearing." 870 P.2d at 904. We held that "due process requires (1) that an inmate receive adequate notice to prepare for a parole release hearing, and (2) that an inmate receive copies or a summary of the information in the Board's file on which the Board will rely." *Id.*

¶22 The procedure in *Labrum*—adequate notice of a hearing and the opportunity to review the Parole Board's information—substantially minimized errors and increased the perception of fairness in the decision-making process by allowing the inmate to

"point out errors" that the Parole Board might have otherwise relied on. *Id.* at 909 (citation omitted).

¶23 We required procedural protections in our *Neese* decision beyond those required in *Labrum*. We considered "what procedural protections the Parole Board must respect before it determines that someone who has never before been adjudicated a sex offender is one and effectively conditions his early release on his participation in sex offender treatment." *Neese*, 2017 UT 89, ¶ 25. The inmate in that case "ha[d] never been convicted of a sex offense or adjudicated a sex offender in a disciplinary, juvenile, or any other proceeding." *Id.* ¶ 32. And he "steadfastly maintained that he was innocent of sexual misconduct." *Id.* We held that due process required the Parole Board to give the inmate more procedural protections—advance written notice, the ability to call witnesses and present evidence (unless the safe administration of the prison system requires otherwise), and a written statement—before it could consider him a sex offender for the purposes of sex-offender-treatment parole conditions. *Id.* ¶ 43.

¶24 The *Neese* procedures substantially "reduce the risk of error and promote the perception of fairness" in three ways: First, they "allow[] inmates to meaningfully present evidence in a situation where they've never before had the opportunity to do so." *Id.* ¶ 44. Second, they "ensur[e] that the Parole Board has carefully considered the evidence." *Id.* ¶ 46. Third, they "creat[e] a record of the Parole Board's adjudication that allows for meaningful due process review." *Id.*

## II. APPLICABILITY OF *NEESE*

¶25 Applying the paradigm of *Neese v. Utah Board of Pardons and Parole*, 2017 UT 89, 416 P.3d 663, and its ancestry, we determine that the Parole Board did not violate Blanke's right to due process by considering him a sex offender for the purposes of sex offender treatment. Two facts here strip away the need for additional procedure. First, Blanke was convicted of attempted child kidnapping—a crime that, at the time of his conviction, required him to register as a sex offender. Second, he admitted in his presentence report, while benefiting from the extensive procedures of a sentencing hearing, to having sexual intercourse with a fifteen-year-old. If he were convicted of it, that admitted conduct would constitute a crime that would also require Blanke to register as a sex offender.

¶26 Given the procedural protections that Blanke enjoyed in pleading guilty to attempted child kidnapping and in admitting to having sexual intercourse with a fifteen-year-old, more procedural protections were unnecessary to satisfy due process before the Parole Board could consider Blanke's unconvicted sex offenses for purposes of sex offender treatment.[9] Additional procedures would neither substantially reduce the risk of error nor protect the appearance of fairness in the Parole Board's decision that Blanke was a sex offender. Thus under our precedents, the Parole Board owed Blanke no more procedural protections before it decided that he is a sex offender.

### A. Blanke Was Adjudicated a Sex Offender

¶27 *Neese*'s "unique procedural protections," 2017 UT 89, ¶ 30, are not required by due process because Blanke was convicted of attempted child kidnapping.[10] As a result of that conviction, he is required under the Utah sex offender registration statute to register as a sex offender. Thus he has been adjudicated

---

[9] The concurrence says that "there is nothing in *Neese* that dictates this result" and that this "is a policy decision that we are making based on the facts of this particular case." *Infra* ¶ 61. We disagree. We are not making a policy decision; rather, we are fulfilling our judicial role, which is to determine what procedural protections due process requires in this case. *Labrum v. Utah State Bd. of Pardons*, 870 P.2d 902, 911 (Utah 1993) ("Due process is flexible and calls for the procedural protections that the given situation demands." (citation omitted) (internal quotation marks omitted)); *Foote v. Utah Bd. of Pardons*, 808 P.2d 734, 735 (Utah 1991) ("Precisely what due process requires of the board of pardons cannot be determined in the abstract, but must be determined only after the facts concerning the procedures followed by the board are [fleshed] out."). And the principles of due process voiced in *Neese* and its ancestry require the result we reach today.

[10] The crime of child kidnapping is committed when a person "intentionally or knowingly, without authority of law, and by any means and in any manner, seizes, confines, detains, or transports a child under the age of 14 without the consent of the victim's parent or guardian, or the consent of a person acting in loco parentis." UTAH CODE § 76-5-301.1(1).

a sex offender,[11] and the Parole Board did not violate due process by refusing to afford him additional procedures before considering him to be a sex offender for parole purposes.

¶28 Blanke contends that he deserves the procedures in *Neese*. But the situation in *Neese* was very different from Blanke's situation. Unlike the *Neese* inmate, Blanke has been adjudicated a sex offender. He was convicted of attempted child kidnapping.[12] At the time of his conviction, attempted child kidnapping was a registerable offense under Utah's sex offender registration statute.[13] So as a result of that conviction, Blanke had to register as a sex offender. And thus he has been adjudicated a sex offender.

---

[11] The concurrence argues that *Neese* "gave little guidance on what it means to have 'been adjudicated a sex offender.'" *Infra* ¶ 56. Consequently, the concurrence believes that "[i]t is not at all clear that *Neese* provides that Blanke 'has been adjudicated a sex offender.'" *Infra* ¶ 54. Although the concurrence may be correct in that the *Neese* opinion left open what we meant by that phrase (we did not need to define it there), this court may define terms that it has used in past cases. And it is patently reasonable to conclude that a sex offender, as used in *Neese*, means someone who fits the definition of a sex offender under the Utah Code.

[12] Blanke argues that the Parole Board cannot classify him as a sex offender because attempted child kidnapping is not one of the crimes listed under Title 76, Chapter 5, Part 4 of the Utah Code, the part named "Sexual Offenses." But regardless of whether a crime is housed in that part of the Utah Code, we hold that the Parole Board may classify an inmate as a sex offender when the inmate is required to register as a sex offender. *See infra* ¶ 32. He also points out that attempted child kidnapping requires no sexual element or motive. Although true, there is a correlation between attempted child kidnapping and sex offenses. *See infra* ¶ 31.

[13] At the time of Blanke's conviction of attempted child kidnapping, Utah Code section 77-27-21.5 governed sex offender registration. That section required sex offenders to register, defining a "sex offender" to include any person convicted of "Section 76-5-301.1, kidnapping of a child" or "attempting" that crime. UTAH CODE § 77-27-21.5(1)(e) (2002) (repealed 2012).

¶29 In contrast to *Neese*, more procedural protections here would not serve the "critical functions" of due process. *See Labrum v. Utah State Bd. of Pardons*, 870 P.2d 902, 909 (Utah 1993). Specifically, they would not substantially increase the accuracy of the Parole Board's decision that Blanke is a sex offender since Blanke already had the opportunity to meaningfully present evidence about the events leading to the attempted child kidnapping conviction.[14] *Neese*, 2017 UT 89, ¶ 44. That is, in part,

---

[14] The concurrence contends that additional procedure is arguably warranted because it "would aid the Parole Board's decision-making to *some* degree." *Infra* ¶ 71. But our precedents require more than that: an inmate must show that "a particular procedural requirement will *substantially further* the [Parole] Board's fact-finding process." *Neese*, 2017 UT 89, ¶ 63 (alteration in original) (emphasis added) (citation omitted); *Monson v. Carver*, 928 P.2d 1017, 1030 (Utah 1996) ("[O]ur decision to extend particular procedural due process requirements under article I, section 7 of the Utah Constitution to certain parole hearings is grounded in the rationale that such requirements will substantially further the accuracy and reliability of the Board's fact-finding process."); *Neel v. Holden*, 886 P.2d 1097, 1103 (Utah 1994) ("[T]he touchstone of due process in the context of parole hearings is whether the proposed procedural due process requirement substantially furthers the accuracy and reliability of the Board's fact-finding process."). Undoubtedly, the robust procedure required in *Neese*—notice, an opportunity to call witnesses, and a written decision—substantially furthers the accuracy of the Parole Board's decision-making, even if we have not explicitly said so. *See also Labrum v. Utah State Bd. of Pardons*, 870 P.2d 902, 909 (Utah 1993) (holding that due process "requires that the inmate know what information the Board will be considering at the hearing and that the inmate know soon enough in advance to have a reasonable opportunity to prepare responses and rebuttal of inaccuracies," in part, because "researchers and courts have discovered many substantial inaccuracies in inmate files" (citation omitted)). And although this court does not always say out loud that the procedural requirement must *substantially* further the fact-finding process, this court has never held that due process requires additional procedure whenever it aids the Parole Board's decision-making to *some* degree. Such a standard would render the required procedure virtually limitless.

the function of plea and sentencing proceedings. Nor would more procedures substantially further the appearance of fairness in the Parole Board's decision-making: an inmate who pleads guilty to a crime that requires him to register under the sex offender registration statute cannot reasonably think it unfair that the Parole Board would then consider him a sex offender and condition his parole on sex offender treatment.

¶30 We note that under the current statutory scheme, an individual convicted of attempted child kidnapping is considered a kidnap offender—not a sex offender. UTAH CODE § 77-41-102(9), (17). But even if the new Sex and Kidnap Offender Registry were to apply to Blanke, we would still conclude that more procedural protections are unnecessary before the Parole Board determines that he is a sex offender. We hold this for two reasons.

¶31 First, the Utah Legislature added attempted child kidnapping as a registerable sex offense in 1997, noting that it was "expanding the definition of sex offender to include other offenses against minors." 1997 Utah Laws 763. Before then, the Legislature had defined sex offender only as someone with a felony conviction under Title 76, Chapter 5, Part 4. UTAH CODE § 77-27-21.5 (1983). The Utah Legislature, then, apparently saw a link between sex offenses and attempted child kidnapping. That view does not lack support, given the apparent significant correlation between child kidnapping and child sex offenses.[15] Second, the crime of child kidnapping carves out an exception for

---

[15] *See* CHILD VICTIMS OF STEREOTYPICAL KIDNAPPINGS KNOWN TO LAW ENFORCEMENT IN 2011, U.S. DEP'T OF JUSTICE 1, 10 (2016), https://ojjdp.ojp.gov/sites/g/files/xyckuh176/files/pubs/249249.pdf (noting that in 2011, 63 percent of stereotypically kidnapped children "were sexually assaulted during detainment" and that "[h]alf of all stereotypical kidnappings in 2011 were sexually motivated crimes against adolescent girls"). Child kidnapping is also often charged with other crimes that require a sexual element. *See, e.g., State v. Strunk*, 846 P.2d 1297, 1299 (Utah 1993) (recounting that the defendant had been charged with child kidnapping and aggravated sexual abuse of a child); *State v. Diaz*, 2002 UT App 288, ¶ 6, 55 P.3d 1131 (noting the defendant had been charged with one count of aggravated kidnapping, or in the alternative, one count of child kidnapping, and one count of aggravated sexual abuse of a child).

the typical family kidnapping—i.e., conduct that would constitute "custodial interference"[16]—making the conduct underlying child kidnapping more likely to be sexually motivated.

¶32 For these reasons, we hold that the procedural protections in *Neese* do not apply when an inmate must register as a sex or kidnap offender.

*B. Blanke Admitted to Having Sexual Intercourse with a Fifteen-Year-Old in a Setting in Which He Had Enough Procedural Protections*

¶33 In addition to Blanke having been adjudicated a sex offender, *Neese*'s procedural protections would not substantially further the "critical functions" of due process because Blanke admitted in his presentence report to sexual misconduct. And the conviction of that misconduct would have required his registration as a sex offender. For that reason alone the Parole Board did not violate due process by determining that Blanke was a sex offender and conditioning his release on sex offender treatment.

¶34 Blanke's admitted conduct constituted a crime that would have required him to register as a sex offender had he been convicted of it. Specifically, he admitted in his presentence report to having sex in 1997 with a fifteen-year-old, when he was forty-three years old. At that time, that conduct constituted the crime of unlawful sexual intercourse, a crime that required registration as a sex offender.[17] By the time of Blanke's kidnapping conviction in

---

[16] *See* UTAH CODE § 76-5-301.1(2) ("Violation of Section 76-5-303 is not a violation of this section."); *id.* § 76-5-303 (2001) (repealed 2010) (criminalizing, among other things, (1) the taking of a child from its lawful custodian with knowledge that "the actor has no legal right to do so" and "with the intent to hold the child for a period substantially longer than the court-awarded parent-time or custody period" and (2) concealing or detaining a "child with intent to deprive" a person "of lawful parent-time, visitation, or custody rights").

[17] In 1997, a sex offender included any person convicted of a "felony, under Title 76, Chapter 5, Part 4, Sexual Offenses." UTAH CODE § 77-27-21.5(1)(e) (1997). And Utah Code section 76-5-401 (1983) made it a third-degree felony (unlawful sexual intercourse) for a person to have "sexual intercourse with a person . . . who is

(continued . . .)

2003, the name of that crime had changed to unlawful sexual activity with a minor, but it still required registration as a sex offender.[18] Regardless of which statute applies—unlawful sexual intercourse or unlawful sexual activity with a minor—Blanke's admitted conduct constituted a crime that would have required him to register as a sex offender had he been convicted of it.

¶35 With that in mind, we turn to Blanke's contention that *Neese* requires the Parole Board to give him more procedural protections at his parole hearing. It does not. Unlike the inmate in *Neese*, Blanke did not "steadfastly maintain[] that he was innocent of sexual misconduct." *Neese*, 2017 UT 89, ¶ 32. Instead, he admitted in the presentence report to conduct that would require him to register as a sex offender if he were convicted of it. What is more, Blanke had the chance to refute the presentence report at his sentencing hearing. But there he only denied having "raped and sodomized" Michelle. Crucially, he did not dispute having sexual intercourse with her, her identity, or her status as a minor.[19] Put differently, that Blanke had sexual intercourse with a fifteen-year-old was an "undisputed background fact[]." *Id.* ¶ 29.

¶36 Unlike in *Neese*, the critical functions of procedural due process have been tended to here. More specifically, they were

---

under sixteen years of age," if the actor was more than three years older than the victim.

[18] In 2003, Utah Code section § 77-27-21.5(1)(e) (2002) defined "sex offender" in part as "any person . . . convicted by this state of . . . a felony violation of Section 76-5-401, unlawful sexual activity with a minor." At that time, unlawful sexual activity with a minor included having "sexual intercourse with [a] minor." UTAH CODE § 76-5-401 (1998). A minor was defined as person who was "14 years of age or older, but younger than 16 years of age, at the time the sexual activity . . . occurred." *Id.* This crime was a third-degree felony "unless the defendant establishe[d] by a preponderance of the evidence the mitigating factor that the defendant [was] less than four years older than the minor at the time the sexual activity occurred." *Id.*

[19] "Section 76-5-401 makes sexual intercourse with a fourteen or fifteen-year-old a violation of the statute, irrespective of defendant's knowledge of the victim's age . . . ." *State v. Martinez*, 2002 UT 80, ¶ 12, 52 P.3d 1276.

fulfilled by virtue of the sentencing proceeding. Blanke's sentencing proceeding greatly "reduce[d] the risk of error" in the Parole Board's decision-making, *id.* ¶ 25, by giving him the opportunity (while being represented by counsel) to refute the presentence report—i.e., to "meaningfully present evidence" to contradict it, *id.* ¶ 44, and to "point out errors," *Labrum*, 870 P.2d at 909 (citation omitted). Indeed, the prosecutor even asked the district court to "allow Mr. Blanke" to "provide anything for the record" and to "let the Court know about any objections he has to the pre-sentence report." The sentencing proceeding also promoted the "appearance of fairness:" an inmate cannot reasonably think it unfair that the Parole Board classifies him as a sex offender when he has admitted to sexual misconduct in the presentence report and then left that admission unchallenged in the sentencing proceeding.

¶37 The bottom line is that the procedural protections of *Neese* do not apply when the Parole Board classifies an inmate as a sex offender and thus conditions the inmate's parole on sex offender treatment when he has admitted, in a proceeding with procedural protections like those of a sentencing hearing, to conduct that would constitute a crime making him a sex or kidnap offender. Consequently, the Parole Board did not violate due process by categorizing Blanke as a sex offender and conditioning his parole on sex offender treatment.

## C. Neese *Does Not Apply, and*
### *Blanke Has Not Asked Us to Expand Its Scope*

¶38 Blanke last argues that he deserves the procedural protections of *Neese* because in making its decision the Parole Board was "fixated on alleged, unconvicted sexual misconduct"— the rape and sexual abuse allegations—rather than on his convicted offense (attempted child kidnapping).[20] But this argument misunderstands our decision in *Neese*. *Neese* held only that due process requires "unique procedural protections" when (1) an inmate has *never* been adjudicated a sex offender in any

---

[20] Blanke also contends his "false confession" to the rape at the 2006 parole hearing does not obviate his right to *Neese* procedures. This argument is irrelevant, however, because Blanke is not entitled to the *Neese* procedures for two other, independent reasons. *See infra* ¶ 39. We therefore decline to address his argument in further detail.

proceeding and (2) the Parole Board considers unconvicted sex offenses in its decision to condition parole on sex offender treatment. *Neese*, 2017 UT 89, ¶ 40. We did not decide in *Neese* whether the Parole Board must afford an inmate additional procedural protections whenever it considers *any* unconvicted sexual misconduct, even when the inmate has been adjudicated a sex offender for *some other* sexual misconduct.

¶39 *Neese* does not apply here because Blanke was adjudicated a sex offender by virtue of his attempted child kidnapping conviction. Beyond that, he admitted in the presentence report to conduct constituting another registerable sex offense. Those two facts push Blanke outside of *Neese*'s protection. The Parole Board thus owed Blanke no additional process before it considered unconvicted sex offenses in its decision to require Blanke to undergo sex offender treatment. Blanke has not asked us to expand the scope of *Neese*, and so we leave that issue for another day.

## CONCLUSION

¶40 We conclude that under these circumstances the Parole Board need not afford Blanke the due process protections explained in *Neese*. We therefore affirm the decision of the court of appeals.

————————

ASSOCIATE CHIEF JUSTICE LEE, concurring in the judgment:

¶41 The founding constitution of the State of Utah gave to the "Board of Pardons" the discretion to "commute punishments" with any "limitations and restrictions" that a majority of the Board might "deem proper." UTAH CONST. art. VII, § 12 (1896). This was the founding-era notion of parole in Utah. The Board's authority was subject to "regulations as may be provided by law, relative to the manner of applying for pardons," *id.*, but never to the demands of "due process" as applied in judicial proceedings. Historically, the Parole Board had untrammeled discretion to decide the terms and conditions of early release from incarceration. Because early release on parole was seen as a matter of executive "grace," our law stopped far short of imposing the

demands of trial process on parole hearings.[21] That understanding is both reinforced in the constitution as it stands today,[22] and confirmed by longstanding legislation[23] and judicial practice.[24] For many decades, the parole process was governed by statutes enacted by the legislature and rules adopted by the Parole Board without interference from this court.

¶42 This court first inserted itself into the Parole Board's procedures in *Foote v. Utah Board of Pardons*, 808 P.2d 734 (Utah 1991). There, we acknowledged that parole decisions in Utah are statutorily committed to the unreviewable discretion of the Board, *id.* at 735 (citing UTAH CODE § 77-27-5(3)), and noted that parole is not generally "a protected liberty interest under the federal due process clause," *id.* at 734 (citing generally *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 14–16 (1979)).[25] But we

_____

[21] *See Neese v. Utah Bd. of Pardons & Parole*, 2017 UT 89, ¶ 164, 416 P.3d 663 (Lee, A.C.J., dissenting) ("Any decision to impose less than the maximum sentence . . . is an act of grace—a grant of greater liberty than the defendant was entitled to. And on that basis the original understanding of the right to due process does not extend to sentencing proceedings." (footnote omitted)).

[22] *See* UTAH CONST. art. VII, § 12(2)(a) ("The Board of Pardons and Parole, by majority vote *and upon other conditions as provided by statute*, *may* grant parole, remit fines, forfeitures, and restitution orders, commute punishments, and grant pardons after convictions, in all cases except treason and impeachments, *subject to regulations as provided by statute*." (emphases added)).

[23] *See* UTAH CODE § 77-27-5(3) ("Decisions of the board in cases involving paroles, pardons, commutations or terminations of sentence, restitution, or remission of fines or forfeitures are final and are not subject to judicial review.").

[24] *See Neese*, 2017 UT 89, ¶ 161 (Lee, A.C.J., dissenting) ("Throughout the late nineteenth and early twentieth centuries, judges and parole boards enjoyed wide discretion to determine the appropriate sentence. Yet sentencing and parole proceedings were never treated like trials." (footnote omitted)).

[25] *See Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7 (1979) (holding that "[t]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence," because "[t]he natural

(continued . . .)

nonetheless asserted, with no analysis of the language of the Utah Constitution and no attempt to tie our decision to its original understanding, that "the mandate of the due process clause" must apply "to all activities of state government." *Id.* at 735. And we remanded the case to the district court for further proceedings and a determination of "[w]hat may constitute due process" in the context of a parole hearing. *Id.*

¶43 We took up the question of "what may constitute due process," *id.*, in an original parole grant hearing in *Labrum v. Utah State Board of Pardons*, 870 P.2d 902 (Utah 1993). *Labrum* embraced the purported "reality" that original parole grant hearings "are analogous to sentencing hearings." *Id.* at 908. And on the basis of that "reality," *Labrum* held that an inmate in such a hearing has a constitutional "due process" right to "know what information the Board will be considering at the hearing . . . soon enough in advance to have a reasonable opportunity to prepare responses and rebuttal of inaccuracies." *Id.* at 909.

¶44 We took the matter a significant step further in *Neese v. Utah Board of Pardons & Parole*, 2017 UT 89, 416 P.3d 663. There we established a new right (among others) of inmates "to call witnesses and present documentary evidence" in original parole grant hearings in which the Parole Board anticipates "classify[ing] as a sex offender an inmate who has never been convicted of a sex offense or otherwise adjudicated a sex offender." *Id.* ¶ 43.

¶45 The new procedural rights established in *Labrum* and *Neese* were not rooted in any historically recognized right to "due process" in parole hearings (or even in sentencing hearings[26]). Instead, these new rights flowed from our court's sense of fairness and equity. We framed our decision as dictated by "'critical functions' of procedural due process" found in our case law—factors that look to whether new procedures will decrease the risk of error and increase the perception of fairness in parole decisions.

---

desire of an individual to be released is indistinguishable from the initial resistance to being confined," and "the conviction, with all its procedural safeguards, has extinguished that liberty right").

[26] *See Neese*, 2017 UT 89, ¶¶ 159–61, (Lee, A.C.J., dissenting) (explaining that sentencing proceedings were not traditionally treated like trials, constrained by due process, or generally subject to the rules of evidence).

*See id.* ¶ 28. But those factors are not a test that bridles judicial discretion. They are a one-way ratchet that justifies any new set of procedures that a majority of this court decides to impose on the Parole Board in the name of due process.

¶46 I dissented on these grounds in *Neese.*[27] In so doing I expressed a shared interest in "preserving the . . . 'safe and effective administration of the prison system.'" *Id.* ¶ 176 (Lee, A.C.J., dissenting). But I emphasized that we have a ready "means" of doing so—in "respect[ing] the traditional role of the Parole Board" and the legislature in "adopting rules of procedure in this field," and "leav[ing] the limits of the Due Process Clause to the procedures historically understood to be guaranteed by the constitution." *Id.* And I lamented the fact that *Neese* not only departed from the original understanding of due process but also failed to provide a transparent test or standard that explained our decision.

¶47 My concerns stand. The *Neese* opinion provides no "workable legal standard" that explains the basis for constitutionalizing new procedural rules to impose on the Parole Board. *Id.* ¶ 141. It just gives a "circular confirmation for whatever procedure a majority of this court may deem appropriate." *Id.*

¶48 Today the court declines to extend *Neese* beyond its specific facts. And I endorse the decision to halt any further extensions of our precedent in this area. I write separately, however, to note that today's decision reinforces the concerns that I raised in *Neese* and confirms that the proper course of action is to repudiate *Neese* and return to the originalist first principles of due process set forth in my dissent in that case.

¶49 The majority cites two principal grounds for refusing to extend the procedures established in *Neese* to the facts of this case.

_____

[27] *See id.* ¶ 184 (explaining that the court failed to "identify an operative legal principle or legal test," and chose instead to "simply identif[y] grounds for ever-expanding procedural mechanisms"); *id.* (noting that the majority's test "provides no stopping point" and allows "a majority of the court" to decide that any additional procedures it prefers to endorse are "required by the Utah Constitution"); *id.* ¶ 185 (maintaining that "[t]he court's articulated factors" and new standards "are as fuzzy and unworkable as they are unmoored from history").

First, the court suggests that we have already decided the question presented. It says that the *Neese* procedures apply only to someone who has never been "'adjudicated a sex offender,'" *supra* ¶ 27 (the phrase at issue in *Neese*, 2017 UT 89, ¶ 25), and asserts that Blanke has in fact "been adjudicated a sex offender," *supra* ¶ 28. Second, the court contends that the due process considerations identified in *Neese*—whether additional procedures would "increase the accuracy of the Parole Board's decision[-making]" and "further the appearance of fairness in the Parole Board's decision-making"—counsel against extending *Neese*. *Supra* ¶ 29.

¶50 But the decision today is not dictated by anything set forth in *Neese*—not by our articulation of the holding, and not by our announcement of any governing standard.[28] Here, as in *Neese*, we are making a policy decision. We are concluding that the facts of this case are less sympathetic than the facts in *Neese*, and thus insufficient to justify extending the reach of our newly constitutionalized parole procedures.

¶51 Like the majority, I would hold that there is no basis for a decision granting Blanke the right to call witnesses (and avail himself of the other rights we announced in *Neese*) in his parole hearing. But I would base that decision on a determination—explained in detail in my dissent in *Neese* and elaborated further below—that there is no due process ground that justifies this court taking over a policymaking function that has long been vested in the Parole Board and subject to oversight by the legislature.

¶52 In the paragraphs below I first show that our articulation of the holding in *Neese* does not resolve the question presented today. I then demonstrate that a serious application of the *Neese* factors would lead to a decision in Blanke's favor. And I conclude by explaining why this court can and should repudiate *Neese* and place these sensitive decisions back in the hands of the Parole Board.

---

[28] The majority seems to acknowledge this point implicitly in its reformulation of the *Neese* standard—in its statement that the *Neese* standard now requires a showing that any additional procedure will "substantially" advance the goals set forth in *Neese*. *See supra* ¶ 29.

I

¶53 The majority first asserts that the concerns that drove the *Neese* decision are not present in the case before us. It says that *Neese* decided "what procedural protections the Parole Board must respect before it determines that someone who has never before been adjudicated a sex offender is one and effectively conditions his early release on his participation in sex offender treatment." *Supra* ¶ 23 (quoting *Neese v. Utah Bd. of Pardons & Parole*, 2017 UT 89, ¶ 25, 416 P.3d 663 (internal quotation marks omitted)). And it holds that *Neese* does not apply to Blanke's situation because "[u]nlike the *Neese* inmate, Blanke has been adjudicated a sex offender." *Supra* ¶ 28.

¶54 But this is pure *ipse dixit*—a preference for a given policy outcome cloaked in a conclusory statement that the premise holds because we say it does. It is not at all clear that *Neese* provides that Blanke "has been adjudicated a sex offender." Nor is that apparent from the Utah criminal code or the record in this case. This is a question of first impression.

¶55 *Neese* held that a person is a "sex offender" if he committed an offense that justifies a Board decision to "condition[] his early release on his participation in sex offender treatment." *Neese*, 2017 UT 89, ¶ 25. But the Utah Code does not regulate the Board's authority to impose such conditions on early release. And it certainly doesn't define what counts as a "sex offense" for these purposes. It is silent on the matter.[29] The same goes for our case law, which reflects the longstanding discretion of the Board to impose the terms and conditions that it sees fit.

¶56 *Neese* likewise gave little guidance on what it means to have "been adjudicated a sex offender." It told us only that a defendant who has been subject to trial and mistrial on a count of "forcible sodomy," *id.* ¶ 2, cannot be deemed to have been "adjudicated" guilty of the kind of offense that leads to a requirement of sex offender treatment as a precondition of early release, *id.* ¶ 25. But that decision in no way dictates an answer to

---

[29] Our criminal code defines a category of "sexual offenses," *see* UTAH CODE § 76-5-401 *et seq.* (Part 4 classifying "Sexual Offenses"), but it nowhere restricts the Parole Board in its identification of which offenses may justify a requirement of sex offender treatment as a precondition of early release on parole.

the question presented in this case. There is no *a priori*, objective sense in which we can conclusively say that Blanke has been "adjudicated a sex offender"—the kind of offender that justifies the Board in conditioning his early release on the completion of sex offender treatment. The standard certainly wasn't articulated in *Neese*.[30] And Blanke credibly argues that at least some of the differences between his case and Neese's support the conclusion that he deserves additional procedure at least as much as Neese did.

¶57 Neese was charged with and tried on a crime our code classifies as a "sexual offense."[31] And the crime in question required proof of a non-consensual "sexual act . . . involving the genitals of one individual and the mouth or anus of another individual."[32] He also had the opportunity to defend against that charge in a full-blown criminal trial—with all the procedural rights that accompany such a proceeding (including the right to call, confront, and cross-examine witnesses).

¶58 Blanke's case is different in several respects. But many of the differences cut in his favor—and cannot themselves justify distinguishing *Neese*. The charges against Blanke (on which he pleaded guilty) were for kidnapping and attempted child kidnapping. Neither of those crimes is classified as a "sexual offense" in the code or requires proof of a non-consensual "sexual

---

[30] The majority acknowledges that *Neese* "left open" what it means to be "adjudicated a sex offender," but insists that "it is patently reasonable" to treat anyone "who fits the definition of a sex offender under the Utah Code" as having been "adjudicated a sex offender." *Supra* ¶ 27 n.11. But this makes my point. I am not saying that what the court is doing today is *unreasonable*. I am just saying that its decision is not dictated by existing law (by *Neese* or the Utah Code). Again, the code does not define "sex offender" for *any* purpose—let alone for mandatory, Board-imposed sex offender treatment purposes. *Supra* ¶¶ 53–54. It tells us only who must register as one. The majority is thus making new policy in its decision today. It may be reasonable policy. But it is not a decision mandated by *Neese* or the code.

[31] *See* Utah Code § 76-5-401 *et seq.* (Part 4 classifying "Sexual Offenses"); *id.* § 76-5-403 (elements of forcible sodomy).

[32] *Id.* § 76-5-403(1).

act." On these grounds, Blanke may be in a stronger position than Neese to complain about the Parole Board branding him a "sex offender" and prescribing sex offender treatment as a precondition of early release.

¶59 Granted, Neese was never convicted of the conduct for which he was required to undergo sex offender treatment. But neither was Blanke. He was convicted of attempted child kidnapping and kidnapping, crimes that, again, were neither classified as "sexual offenses" nor required proof of a non-consensual "sexual act."

¶60 The majority dismisses these arguments, noting that the crime of attempted child kidnapping "was a registerable offense under Utah's sex offender registration statute" at the time of Blanke's guilty plea, *supra* ¶ 28, and asserting that "there is a correlation between attempted child kidnapping and sex offenses," *supra* ¶ 28 n.12. On these bases, the court concludes that Blanke "has been adjudicated a sex offender." *Supra* ¶ 28. It also notes that Blanke did not object to allegations in a presentence report that he engaged in conduct that "constituted the crime of unlawful sexual intercourse" (statutory rape) under Utah Code section 76-5-401 (1983). *Supra* ¶ 34. And because that conduct "constituted a crime that would have required him to register as a sex offender had he been convicted of it," *supra* ¶ 34, the court suggests that Blanke's circumstances fall outside the holding of *Neese*.

¶61 But again, there is nothing in *Neese* that dictates this result. *We* might wish to treat Blanke as a "sex offender" of the sort that may justly be required to undergo sex offender treatment as a precondition of early release on parole. But that crucial definition of "sex offender" is nowhere stated in *Neese* and nowhere provided in our statutes governing parole. This is a policy decision that we are making based on the facts of this particular case. Attempted child kidnapping is neither classified as a sexual offense nor requires proof of a non-consensual sexual act. The same goes for kidnapping. And although there was conduct mentioned in the presentence report in the kidnapping case that could have constituted a sexual offense *if it had been charged*, *see supra* ¶ 34, there was no charge and thus no conviction. If we justify the Board's decision based on the fact that Blanke could have been convicted of statutory rape and required to register as a sex offender, Blanke is in a worse position than Neese was—he is being required to undergo treatment for

conduct for which he was never even charged or tried, let alone convicted. Clearly, then, Blanke's failure to "object" to the allegation in the presentence report does not show that he has been "adjudicated a sex offender" under *Neese*.

¶62 I am not suggesting that Blanke has a clear-cut case under *Neese*. I am just noting that *Neese* does not tell us who counts as the kind of "sex offender" that the Board may require to participate in sex offender treatment as a precondition of early release. I have cited a difference between this case and *Neese* that seems to make Blanke's case the more sympathetic one—that Neese was charged with and tried on a crime classified as a "sexual offense" and requiring proof of a non-consensual "sexual act," while Blanke was charged with and pleaded guilty to crimes with neither of those features. The majority, by contrast, cites differences that seem to cut in the opposite direction—that Neese pleaded guilty only to charges of obstruction of justice, theft, and burglary, while Blanke pleaded guilty to one "registrable offense" and failed to contest allegations of misconduct that would have constituted another. Fair enough. But none of this tells us whether Blanke has been "adjudicated" of the kind of sex offense that should require him to participate in sex offender treatment as a precondition of early release.

¶63 This is because there is no law governing the imposition of such a precondition. Again, this is unsurprising because these decisions have long been matters of discretion for the Parole Board. We cut back on that discretion in *Neese* when we held that a person charged with and tried on a sex offense resulting in a mistrial could not be subjected to sex offender treatment by the Parole Board without additional procedures mandated by this court. And in so ruling we characterized the imposition of such a condition as a determination by the Board that an inmate is an "adjudicated . . . sex offender." But that does not tell us whether a person charged only with attempted child kidnapping and kidnapping has been "adjudicated" of the kind of "sex offense" that should require him to go through sex offender treatment as a precondition of early release on parole.

¶64 The court is thus making a new policy decision in ruling that "the Parole Board may classify an inmate as a sex offender" (and therefore require sex offender treatment as a condition of early release on parole) "when the inmate is required to register as a sex offender," *supra* ¶ 28 n.12, or when an inmate fails to deny conduct that *would have* constituted a registrable offense (*if* he had

been charged and convicted), *supra* ¶ 33. Nothing in *Neese*, and certainly nothing in the statutes and regulations governing parole, dictates the court's decision.

## II

¶65 The majority also insists that its decision follows from the legal "paradigm" set forth in *Neese v. Utah Board of Pardons & Parole*, 2017 UT 89, 416 P.3d 663. *Supra* ¶ 25. Citing the "'critical functions' of due process" identified in that case, the court says that "more procedural protections here" would neither "substantially increase the accuracy of the Parole Board's decision that Blanke is a sex offender" nor "substantially further the appearance of fairness." *Supra* ¶ 29.

¶66 If we apply the plain language of *Neese*—which does not require that procedures do *anything* "substantially"[33]—I can't see

---

[33] The majority insists that our case law has always required an inmate to show "that 'a particular procedural requirement will *substantially further* the [Parole] Board's fact-finding process.'" *Supra* ¶ 29 n.14 (alteration in original) (citing *Neese v. Utah Bd. of Pardons & Parole*, 2017 UT 89, ¶ 63, 416 P.3d 663). And it seems to attach this qualifier to *Neese*'s "appearance of fairness" factor as well. *See supra* ¶ 29. But this is a reformulation of the *Neese* standard. In *Neese*, we repeatedly asserted that due process demands additional procedures whenever they will "reduce the risk of error," 2017 UT 89, ¶¶ 24, 25, 29, 44, "minimiz[e] error," *id.* ¶¶ 28, 31; *see also id.* ¶¶ 53, 55, or ensure "factual accuracy," *see id.* ¶ 62 (citation omitted). And we held that additional safeguards were necessary in Neese's case because we "lack[ed] confidence in the accuracy of the[] proceedings," *id.* ¶ 34, and had "concerns for accuracy in meting out punishment," *id.* ¶ 113. In the past, we have cited a standard of "substantially" furthering accuracy or "meaningfully" reducing error only when *rejecting* requests for more procedure. *See id.* ¶¶ 54, 63; *see also Padilla v. Utah Bd. of Pardons & Parole*, 947 P.2d 664, 670 (Utah 1997) (rejecting an inmate's request that his counsel be allowed to "speak for him" and "confer with him" during portions of a Board hearing); *Monson v. Carver*, 928 P.2d 1017, 1030 (Utah 1996) (rejecting an inmate's request for counsel); *Neel v. Holden*, 886 P.2d 1097, 1103 (Utah 1994) (rejecting an inmate's request that his counsel be allowed to address the Board). So the majority's new, heightened standard underscores the internal inconsistency and ultimate

(continued . . .)

how that could be so. It would be a rare case indeed where additional precautions would not increase accuracy, and an even rarer one where such safeguards would not enhance the inmate's "reasonable," *see supra* ¶¶ 29, 36, perception of fairness. *See Neese*, 2017 UT 89, ¶ 141 (Lee, A.C.J., dissenting) ("*Any* additional procedure, after all, can be said to 'minimiz[e] error' and 'preserv[e] the integrity of the [parole] process.'" (alterations in original)). And this does not strike me as such a case.

¶67 Even if we apply the majority's new and improved "substantially increases" standard, it is not clear to me that Blanke should lose. The *Neese* factors, after all, are "not a legal test." *Id.* ¶ 182. They are just a recitation of the "*benefits* of additional procedure." *Id.* And when our test cites "only the benefits—the upsides—of additional procedure[,] we will have a one-way ratchet that will always result in *more* constitutionally required procedure."[34] *Id.* This "mode of reasoning" thus "provides no

---

unworkability of the *Neese* framework. And today's decision continues the sad tradition of invoking one standard when we decide to *require* new procedural safeguards and another when we decide to *reject* such safeguards.

[34] In *Labrum* we gave an after-the-fact nod to the idea that additional requirements "may add administrative burdens for the limited staff of the Board." *Labrum v. Utah State Bd. of Pardons*, 870 P.2d 902, 911 (Utah 1993). But we immediately dismissed that concern, stating that "[i]t has never been an option for the government to argue that constitutional due process need not be provided because it creates administrative burdens." *Id.* Our "test" thus stands in contrast to the balancing test sometimes applied as a matter of federal law. That test, under *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), seems problematic to the extent it allows judges to constitutionalize new procedures on the basis of their case-by-case sense of the process that seems due in a given circumstance. *See In re Discipline of Steffensen*, 2016 UT 18, ¶ 7, 373 P.3d 186 (noting that "the Due Process Clause is not a free-wheeling constitutional license for courts to assure fairness on a case-by-case basis" but a "constitutional standard . . . measured by reference to 'traditional notions of fair play and substantial justice'" (citation omitted)). But at least the federal standard entails an actual balance—with costs to weigh against benefits. *See Mathews*, 424 U.S. at 335 (balancing the importance of

(continued . . .)

stopping point," except in any limits that may be found in the fluid and opaque policy preferences of a "majority of the court." *See id.* ¶ 184. That is the only real limit that I can find in the *Neese* framework—whatever a majority of this court thinks will increase ("substantially" or otherwise) accuracy and the perception of fairness. And I think we need to own it if that is our standard. *See id.* ¶ 147 (noting that if our due process standard is simply "anything a majority of us deem[s] necessary is required," "we should say so" (internal quotation marks omitted)).

¶68  I flesh out these concerns below. First I show that the *Neese* concern for accuracy seems to cut in Blanke's favor. Then I make a parallel point about the concern for an inmate's perception of fairness.

A

¶69 The court says that Blanke's requested procedures will not "substantially" enhance accuracy because he "already had the opportunity to 'meaningfully present evidence'" of relevance to the parole decision in earlier sentencing proceedings. *Supra* ¶ 29. Blanke had counsel in those proceedings and was aware of the contents of the presentence report. *Supra* ¶ 36. And the court notes that he could have but failed to challenge the State's allegations against him. *Supra* ¶ 36.

¶70  I can't see how this means that the accuracy of the Parole Board's decision would not be "substantially" enhanced by additional procedure. In the attempted child kidnapping case, the presentence report would have told Blanke that he was charged with an offense that would require him to register as one convicted of that crime. In the kidnapping case, the presentence report would have told him that the allegations *could have led* to a separate charge of "unlawful sexual intercourse" under Utah Code section 76-5-401 (1983). But in neither case would Blanke have known that he needed to challenge the allegations to preserve procedural rights in objecting to sex offender treatment as a precondition of his early release on parole. The majority does

the interest affected, risk of error, and probable value of additional or substitute procedural safeguards against "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail").

not contend otherwise. It simply says it is enough that Blanke "had the chance to refute the presentence report," *supra* ¶ 35, "while being represented by counsel," *supra* ¶ 36.

¶71 But the mere existence of a previous "chance" to put on evidence does not defeat Blanke's right to additional procedure under *Neese*. The first *Neese* factor simply asks whether additional procedures would "reduce the risk of error" in the Parole Board's decision-making, *Neese v. Utah Bd. of Pardons & Parole*, 2017 UT 89, ¶ 24, 416 P.3d 663, and additional procedure would surely help the Parole Board make a more informed decision as to whether Blanke committed an act justifying a requirement of sex offender treatment as a precondition of early release. The majority insists that Blanke "admitted" that he committed "conduct that would have required him to register as a sex offender had he been convicted of it." *Supra* ¶ 34. But he didn't expressly "admit" to anything in that proceeding. He just failed to deny every allegation in a presentence report. And those remaining allegations have never been "adjudicated," at least if that means ruled on after a full and fair trial (as *Neese* suggests). Ultimately, moreover, there remains a significant, disputed question about *what facts* are sufficient to justify the imposition of a requirement of sex offender treatment as a precondition of early release. *See supra* ¶¶ 55–62. Surely additional procedure would aid the Parole Board's decision-making to *some* degree. And that is all that the first *Neese* factor requires.[35]

---

[35] The majority disagrees with my assertion that *Neese* demands additional procedure whenever it would increase the accuracy of the Board's decisions to "*some* degree." *Supra* ¶ 29 n.14. But my reading is borne out by the terms of the *Neese* majority opinion. *See supra* ¶ 66 n.33. Today's majority's reframing, moreover, doesn't meaningfully raise the bar. A requirement that a procedure "substantially" increase accuracy (or the perception of fairness) still "render[s] the required procedure virtually limitless." *Supra* ¶ 29 n.14. Not much will change so long as the standard weighs only a procedure's benefits (and not its costs), *supra* ¶ 67 n.34, and fails to tie the required parole hearing procedures to the original meaning of "due process."

The addition of "substantially" may do little more than encourage inmates to demand ever more robust procedures. *See*

(continued . . .)

¶72 The majority's contrary conclusion cannot be reconciled with our opinion in *Neese*. After all, in that case the inmate had been openly charged with forcible sodomy and afforded the full range of procedural protections available *at trial*. *See Neese*, 2017 UT 89, ¶ 2. True, the trial did not result in a conviction; but neither did it result in an acquittal. The result was a mistrial, *id.*, and the record of the trial would have been available to the Parole Board when Neese sought early release on the lesser charges on which he pleaded guilty and was eventually sentenced. So if the question is just whether an inmate has had a prior "chance" or "opportunity" to voice his opposition to a sex offense allegation that the Board is using to justify a requirement of sex offender treatment, then surely Neese had that. The majority cannot claim that Blanke's opportunity was somehow *better* than Neese's.

¶73 When Blanke pleaded guilty to kidnapping and attempted child kidnapping, he would have had no notice that he was agreeing to subject himself to sex offender treatment as a precondition of early release. He would have had little, if any, incentive to contest the allegations on those grounds. Neese, by contrast, knew that he had been charged with a crime classified as a "sexual offense" and requiring proof of a non-consensual "sexual act." *See supra* ¶ 58. And that knowledge arguably put him on greater notice that the Parole Board might require sex offender treatment as a precondition of early release.

¶74 The majority seeks to avoid this problem by noting that Neese "steadfastly maintain[ed] that he was innocent" while Blanke effectively "admitted" to unlawful sexual intercourse with a minor. *Supra* ¶ 35 (citation omitted). But the first *Neese* factor does not ask whether the inmate seeking additional procedural protections previously admitted to the conduct the Board cites as its reason for requiring sex offender treatment. It asks whether

---

*supra* ¶ 29 n.14 ("Undoubtedly, the robust procedure required in *Neese*—notice, an opportunity to call witnesses, and a written decision—substantially furthers the accuracy of the Parole Board's decision-making, even if we have not explicitly said so."). The implication of today's majority seems to be this: Ask for too little protection, and your procedures will be dismissed for not "substantially" increasing the accuracy of the Board's decision-making. But ask for more, and your procedures may be mandated by this court.

those additional protections would increase the objective accuracy of the Parole Board's decision-making. *See Neese*, 2017 UT 89, ¶ 25. And once we have held that the Board's accuracy is improved by the right to call more witnesses *in addition* to those called at a previous trial, we cannot hold that accuracy is not enhanced by the same right in a case where the inmate never called *any* witnesses and had little incentive to do so.

B

¶75 The second *Neese* factor points toward the same conclusion. The majority says that Blanke "cannot reasonably think it unfair" that the Parole Board is requiring sex offender treatment as a precondition of his early release on parole based on (a) a conviction of an offense (attempted child kidnapping) requiring registration as a sex offender, or (b) allegations in a presentence report evidencing an uncharged crime (of "unlawful sexual intercourse") that were left unchallenged in a prior sentencing proceeding but also would have required registration. *Supra* ¶¶ 29, 36. But Blanke clearly does "think it unfair," as evidenced by his resilient prosecution of his case in both the court of appeals and this court. And if pure gut-level "fairness" is the test, I can hardly blame him.

¶76 In *Neese* we highlighted a broad range of harms and stigmas that result when an inmate is labeled a "sex offender" in the prison system. *Neese v. Utah Bd. of Pardons & Parole*, 2017 UT 89, ¶ 31, 416 P.3d 663 (explaining, *inter alia*, the invasive nature of sex offender treatment and research showing that inmates classified as sex offenders are more likely to be physically and sexually abused). And we imposed new procedural requirements on parole decisions based on our concern for the reliance interests of a person in Neese's circumstances. We emphasized that Neese could not have known that allegations "not logically implicit in the factual basis of the[] allocution" leading to his guilty plea could "come roaring back at [a] parole hearing and result in a sentence decades longer than the sentence all parties contemplated based on the sentencing matrix at the time." *Id.* ¶ 33.

¶77 If we really believed all that, we would extend the protections established in *Neese* to Blanke. When Blanke pleaded guilty to attempted child kidnapping, he could not have known that the registration requirement for that offense would "come roaring back" and result in a requirement of sex offender treatment as a precondition to his early release—a precondition

that will significantly extend the sentence that everyone would have contemplated "based on the sentencing matrix at the time." *See id.* Nor could he have anticipated that an attempted child kidnapping plea would lead to his classification in prison as a sex offender—and all the various harms and stigmas we warned of in *Neese*.

¶78 The majority attempts to skirt this issue by citing statistics that show an "apparent significant correlation between child kidnapping and child sex offenses," and by noting that the Utah Legislature "saw" such a correlation when it required registration for child kidnapping offenses. *Supra* ¶ 31. There may indeed be *a* correlation. But that is not the question. The question is whether there is a *sufficient* correlation to justify the Parole Board's decision to require sex offender treatment as a precondition of early release for inmates convicted of child kidnapping offenses. Blanke could not have anticipated the imposition of such a condition—at least not any more than Neese could have anticipated that he would be subject to that condition when he secured a mistrial on a forcible sodomy charge and pleaded guilty to lesser, nonsexual crimes. At bottom, the question in both cases is a policy question—one long left to the Parole Board and legislature, but seized by this court in *Neese*. And to the extent the answer to that policy question turns on the inmate's perception of fairness, I see little room for the court's conclusion that Blanke "cannot reasonably think" the Parole Board's process in this case as "unfair" as the one we condemned in *Neese*.

¶79 The same goes for the majority's reliance on Blanke's failure to refute allegations in the kidnapping presentence report. The majority notes that the allegations in that report evidenced the uncharged crime of "unlawful sexual intercourse" under Utah Code section 76-5-401 (1983), a crime that "required registration as a sex offender." *Supra* ¶ 34. And it emphasizes that Blanke never "refute[d]" the allegations of sexual intercourse in the presentence report, but only "denied having 'raped and sodomized'" the victim. *Supra* ¶ 35. In the majority's view, this establishes that Blanke's "sexual intercourse with a fifteen-year-old was an 'undisputed background fact[].'" *Supra* ¶ 35 (alteration in original) (citation omitted). With this in mind, the court concludes that Blanke "cannot reasonably think it unfair" for the Parole Board to accept that "fact" as a basis for requiring sex offender treatment as a precondition of early release on parole. *Supra* ¶ 36.

¶80  I disagree. Blanke was never even *charged* with "unlawful sexual intercourse." At the time of his plea allocution on the charge of kidnapping, moreover, he could not have known that allegations that could sustain such an uncharged offense would "come roaring back," *Neese*, 2017 UT 89, ¶ 33, to substantially increase the sentence that he otherwise expected (and no doubt took into account when deciding to plead guilty). At that time, Blanke would have seen no correlation between a failure to oppose these allegations and the extent of his eventual prison time—not to mention his classification as a sex offender in prison and exposure to all the stigmas and harms associated with that classification.

¶81  So if we really believe that the answer to whether more procedure is required turns on an "inmate's perception of fairness," *id.* ¶ 25, we should rule in Blanke's favor. The *Neese* factors ultimately can point in only one direction. If we take them seriously here, we need to recognize the strength of Blanke's position.

## III

¶82 None of the above should be interpreted as an endorsement of the standards set forth in *Neese* or of Blanke's position on appeal. I stand by the view set forth in my dissenting opinion in *Neese*. I find the standards laid out in *Neese* "as fuzzy and unworkable as they are unmoored from history." *Neese v. Utah Bd. of Pardons & Parole*, 2017 UT 89, ¶ 185, 416 P.3d 663 (Lee, A.C.J., dissenting). Absent an originalist basis for constitutionalizing our preferred procedure for parole proceedings, I would reject the *Neese* framework and leave the matter to those whose discretion and expertise have long governed in this sensitive field—the Parole Board, with oversight by the legislature.

¶83 The majority contends that we should not repudiate the framework set forth in *Neese* because the parties "have not asked us to do so" and we have declined to order supplemental briefing on the matter. *See supra* ¶ 11 n.6. But the parties do not dictate when we revisit our precedents.[36] *See supra* ¶ 11 n.6. And while it

---

[36] It is emphatically and uniquely *our* prerogative and responsibility to "say what the law is." *See McDonald v. Fid. & Deposit Co. of Md.*, 2020 UT 11, ¶ 33, --- P.3d ---. Admittedly, the

(continued . . .)

is wise practice to seek the parties' input through supplemental briefing,[37] there is no hard-and-fast rule that we do so, as the majority acknowledges.[38] *See supra* ¶ 11 n.6 (recognizing that "we

---

parties dictate the claims and issues presented for our review. *See Utah Stream Access Coal. v. V.R. Acquisitions, LLC*, 2019 UT 7, ¶ 36, 439 P.3d 593, (noting that a "core component of our adversary system" is "the notion that the plaintiff is the master of the complaint," and that we "leave it to the parties to plead claims and defenses"). But they have no authority to dictate or stipulate the terms of our law. *See McDonald*, 2020 UT 11, ¶ 33 (holding that "we are not limited to a choice between the parties' competing positions" because "[w]e must get the law right, even if in so doing we establish a standard that differs from either of the approaches presented in the briefing on appeal"); *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991) ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law.").

[37] *See Utah Dep't of Transp. v. Target Corp.*, 2020 UT 10, ¶ 18 n.2, --- P.3d --- (explaining that "we are reluctant to resolve a case on the basis of a revised legal standard without giving the parties an opportunity to first be heard on the matter" and often choose to order supplemental briefing because we assume parties "would rather have input in our process instead of seeing a revised legal standard for the first time in a published opinion").

[38] This is confirmed by the course we have taken in a number of recent decisions. Important examples include *Target*, 2020 UT 10, and *State v. Lujan*, 2020 UT 5, --- P.3d ---. In these cases, the parties' initial briefing left us concerned that our decision might require the overruling or reformulation of one or more of our precedents. No party had asked us to take that course. But we recognized that our disposition of the questions presented would require us to interpret and apply some precedents of concern. And our concerns about the viability of those precedents, combined with our acknowledged responsibility to get the law right, led to our issuance of *sua sponte* supplemental briefing orders—orders *requiring* the parties to brief whether our precedents should be overruled, repudiated, or reformulated. *See* Supplemental Briefing Order (Jan. 7, 2019), *Target*, 2020 UT 10

(continued . . .)

have the power to revisit precedent at any time" even if it is our "preferred practice" to order supplemental briefing "if we are considering overturning or reformulating precedent").

¶84 Today's majority may prefer to decide this case without any briefing on whether and to what extent we should reformulate or repudiate our decision in *Neese*. That is the court's prerogative. But having made that decision, the majority is in no position to fault me for explaining why I think we should do so. And the court is likewise in no position to blame the decision not to reconsider *Neese* on a lack of briefing—the lack of such briefing is a result of its own decision.

¶85 My proposed approach, moreover, does not require an outright reversal of the judgment in the *Neese* decision. It just requires us to own the unworkability of the standards set forth in that decision and to announce our intention to decline to extend it any further. And there is no question that we have the power to do that. As the majority explains, there is no single category of "overruling." *See supra* ¶ 11 n.6. A decision to clarify, refine, or reconcile our past precedent is not the same thing as a decision to flatly reverse a prior judgment. In the latter circumstance, we are more openly implicating the central underpinnings of the doctrine of *stare decisis*—reliance interests of parties and the public.[39] *See*

_____

(asking whether "any of the standards set forth in our cases [should] be refined or reformulated in any way"); Supplemental Briefing Order (Aug. 20, 2018), *Lujan*, 2020 UT 5 (asking whether "our decision in *State v. Ramirez* [should] be overruled if it runs counter to the original understanding of due process" or if the "factors set forth in that decision [are] . . . subject to revision or refinement").

[39] Even then, recent precedent makes clear that we may overrule a case without the request or input of the parties. In *Thomas v. Hillyard*, 2019 UT 29, ¶ 18, 445 P.3d 521, for example, we overruled *Jensen v. Young*, 2010 UT 67, 245 P.3d 731, without invitation from the parties because we identified "two lines of cases" that had "taken inconsistent and confusing paths." And in *State v. Steed*, 2015 UT 76, ¶ 8, 357 P.3d 547, we noted that a prior "articulation" of an element of our mootness exception in our past cases was "overly broad." We thus "clarif[ied]" the "proper articulation" and "disavow[ed] any language in our prior cases stating otherwise"—again without invitation from the parties. *Id.*

*Eldridge v. Johndrow*, 2015 UT 21, ¶ 35, 345 P.3d 553 (explaining that in deciding whether to overrule a case we consider "the extent to which people's reliance on the precedent would create injustice or hardship if it were overturned"). But these concerns are less obvious (and sometimes not at all present) when we are just clarifying or refining our precedent,[40] and even less so when we are just limiting a prior decision to its facts.[41] That kind of move is entirely consistent with the notion of *stare decisis*—Latin for "stand[ing]" by what is "decided." *Stare decisis*, BLACK'S LAW DICTIONARY (11th ed. 2019). We clearly stand by what is decided when we preserve the square holding of a prior decision. And nothing in the doctrine requires us to take statements in our prior decisions and extend them to their logical extreme.

¶86 The upshot is that we do not need to be asked by the parties—or order the parties to chime in—before we can decide to limit our precedent. The discretion to refine and curtail the reach of our prior precedents is central to the judicial function of an appellate court. It is a core element of what we do. And that discretion is not cabined by the terms of the parties' briefing—or our own decision not to order supplemental briefing.

IV

¶87 For these reasons I endorse the majority's decision to stop short of any further intrusion into the longstanding prerogatives of the Parole Board. But I lament the effect of the court's opinion on the coherence of our law in this field. And I suggest that it is time to end our ongoing, standardless extension of problematic precedent.

¶88 *Neese* seemed to mandate an ever-expanding set of procedural requirements for parole proceedings involving a requirement of sex offender treatment as a precondition of early release. But *Blanke* now stands as a reminder that new procedures

---

[40] *See, e.g., Target*, 2020 UT 10, ¶¶ 18–19, 22 (clarifying and refining an area of our takings jurisprudence and explaining that "we have broader license to reformulate and clarify our law . . . where we are merely reformulating and clarifying, and not outright overruling a prior decision").

[41] *See M.J. v. Wisan*, 2016 UT 13, ¶ 29 n.5, 371 P.3d 21 (repudiating the analysis of a prior decision and limiting it to its facts in the absence of any party asking us to revisit the case).

may not be required when a majority of this court decides to impose a limit. And this will leave the Parole Board and lower courts without any guideposts for what procedures are necessary going forward except their best guess at what a majority of this court might find "reasonably" fair.

¶89 We should avoid this dissonance and confusion by returning to the originalist first principles set forth in my dissenting opinion in *Neese*. We can do so here without running afoul of the doctrine of *stare decisis*. That doctrine calls for respect for precedent in the interest of preserving stability in our law. But as I have explained, we are always free to stop extending our decisions. And in any case, our law as it stands is anything but stable. Today's decision leaves inmates and the Parole Board more confused about what our precedent is in this area. This uncertain state leaves us free to revise and clarify our law. *See Eldridge v. Johndrow*, 2015 UT 21, ¶¶ 43–44, 345 P.3d 553 (arguing that we should overturn precedent that is highly "fact-intensive" and leaves lower courts "without guidance"). I would do so in a manner that restores the original deference given to the Parole Board and the legislature in this important field.